# THE STATE v. DANIEL E. NAUGHTON,
## Appellant.

### Division Two, June 8, 1909.

1. **INCRIMINATING TESTIMONY: Before Grand Jury: Criminal Cause.** The investigation of a crime before a grand jury falls within the term "criminal cause," and the Constitution specifically says that "no person shall be compelled to testify against himself in a criminal cause."

2. ———: ———: **Indictment: Abatement.** Where the grand jury was seeking to investigate the conduct of defendant himself, and being brought before it upon compulsion of a subpoena he was asked questions relating to the crime with which he was later charged, and refused to answer on the expressed ground that his answers would tend to incriminate him, an indictment charging him with the crime then being investigated should, on his plea in abatement, be quashed. To sustain such an indictment would be to indorse and approve a violation of the mandate of the Constitution, and do violence to orderly and decent procedure in the courts.

3. ———: ———: ———: ———: **Extortion.** It is intolerable that one whose conduct is being investigated for the purpose of fixing on him a criminal charge should be summoned before the grand jury to testify against himself and to furnish evidence upon which he may be indicted. It is a plain violation of both the letter and spirit of the Constitution. It is an attempt at compulsory self-discovery by extorting the party's oath.

4. ———: ———: ———: ———: **The State's Attitude.** The State cannot trample the Constitution under foot, and yet cling to an advantage thereby unlawfully and wrongfully gained.

5. ———: ———: ———: ———: **Found on Defendant's Testimony.** It is immaterial whether or not the indictment was found upon the testimony of the defendant who was compelled by subpoena to appear before the grand jury and testify against himself. The constitutional guaranty is, not that no person shall be compelled to give evidence against himself which is made the basis of an indictment against him, but it is that he shall not be compelled to testify against himself in a criminal cause.

6. ———: ———: ———: ———: **Material: Link.** It is not necessary that the evidence elicited from a defendant compelled to testify against himself before the grand jury, should

be a direct admission of the crime charged; if he be required to give any evidence which might lead to other evidence that would tend to convict him, or be a link in the chain of testimony, he has been compelled to testify against himself, and the indictment should be quashed.

7. **ACCESSORY: Knowledge of Crime.** An accessory after the fact must have had knowledge at the time the assistance was rendered that the principal had committed the alleged crime; and unless such knowledge is shown, no conviction can stand.

8. ————: ————: **Bribery: Possession of Money: Explanation.** It is incumbent upon the State to establish by substantial evidence every essential element of the crime with which the party is charged; and where there is no evidence whatever that defendant (although he was shown to have had in his possession the identical money given to two delegates of a municipal assembly as a bribe) knew they had received it as a bribe, and no evidence of how he came in possession of it, and no evidence that he had any opportunity to confer with them after the crime was committed, and they, called as) witnesses by the State, testify that they did not give the money to defendant, a conviction under an indictment charging him as being an accessory after the fact cannot stand. Nor is defendant required, by the fact that he is shown to have had the bribe money in his possession, to furnish explanation of how he came to have it.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher,* Judge.

REVERSED AND REMANDED (*with directions*).

*T. J. Rowe, Hiram N. Moore, Thos. J. Rowe, Jr.,* and *Henry Rowe* for appellant.

(1) Defendant's plea in abatement should have been sustained. U. S. v. Edgerton, 80 Fed. 374; Boyd v. U. S., 116 U. S. 639; State v. Froseth, 16 Minn. 296; Sharpe Case, 107 N. Y. 477; People v. Haines, 107 N. Y. Supp. 54; People v. Sellick, 4 N. Y. Crim. Rep. 329; People v. Lauder, 82 Mich. 109; Boone v. People, 148 Ill. 440; State v. Duncan, 4 L. R. A. (U. S.) 1144. What of law, of justice, of Constitution, exists in this State if such

procedure is permitted to pass without rebuke, censure and condemnation? No country governed by any settled laws, or wherein its citizens are treated with common humanity, could furnish any occurrence of such unparalleled abuse of power. The poorest wretch who crawls on British soil would have in the administration of the law an adamantine shield which would protect him against such a wicked, nefarious and outrageous assault upon his constitutional right; and no officer would dare violate a sacred constitutional right without being visited with swift, severe and condign punishment. The government that would submissively tolerate such an inquisition and forego a direct assault on its Constitution without rebuke, condemnation and censure, would be a disgrace to humanity and civilization. Nowhere under the flag of monarchial England would such procedure be possible. The official daring to usurp such powers would be driven from office in disgrace. (2) The court should have instructed the jury that under the pleadings and proof defendant was not guilty of the offense charged in the indictment. There is no evidence in the case that defendant knew or could have known that Ascher had made a corrupt agreement with Warner and that as a part of the agreement be paid Priesmeyer five hundred dollars. There is not a word of evidence that he knew that Priesmeyer received $500 from Ascher, and there is no evidence tending to prove that he received $500 from either Priesmeyer or Warner, but on the contrary the only affirmative evidence on that subject offered by the State is to the effect that neither Warner nor Priesmeyer gave him $500 on the night of October 18, 1907. It would have been impossible for him to have known that either Warner or Priesmeyer, on October 19, 1907, was guilty of a felony. Can it be contended that because defendant refused to testify before the grand jury he aided Priesmeyer or Warner to avoid arrest, trial, conviction or punishment? The

State v. Naughton.

record shows that defendant's conviction is without evidence and that he was without evidence indicted and convicted because he saw fit to exercise a guaranteed constitutional right.

*Elliott W. Major,* Attorney-General, and *Chas. G. Revelle,* Assistant Attorney-General, for the State.

(1) The plea does not allege that defendant's evidence was the only evidence before the jury, or that the indictment was based in part upon his evidence, or that the jury was influenced in returning the indictment by any such evidence, or that he testified to any material fact to the case of the prosecution, or that his substantial rights were thereby prejudiced. On the contrary, the plea discloses upon its face that he did not testify to any material fact, but instead refused to testify in most instances, and in this was sustained by the court. The questions to which he did make reply, according to the plea, were answered in such a way as to furnish no evidence against him, but if anything, it was in his favor, and it will not be presumed that the grand jury in disregard of its duty allowed themselves to be influenced to his prejudice. (a) The indictment, which must be considered in determining the sufficiency of the plea, was returned in the usual manner of presenting indictments, with the names of competent witnesses indorsed thereon, defendant's name not appearing on it, and the presumption must be indulged that the indictment was found on competent evidence and in the manner pointed out by law, and this presumption is sufficient to support the regularity of the indictment when it is not, as in this case, rebutted by either the plea or evidence. People v. Hayes, 28 N. Y. (Misc.) 94; State v. Hawks, 56 Minn. 138; State v. Lauder, 82 Mich. 113; Hope v. People, 83 N. Y. 418; Jones v. State, 81 Ala.

221 Sup—26

79; State v. Grady, 84 Mo. 223; State v. Faulkner, 185 Mo. 696. (b) If by the plea defendant means to assign as cause the violation of his constitutional rights as to being compelled to testify against himself, his plea falls far short of the requirements in both form and substance, and the disclosures of the record do not support the contention. The constitutional guaranty is, not that no person shall be subpoenaed or sworn as a witness in an investigation of his own conduct, but it is that he shall not be compelled to testify—that is, give criminating evidence against himself. It is not an invasion of his constitutional rights to subpœna him, to require him to appear and be sworn, nor to testify upon any matter that would not criminate him, or would not be against himself. This much the law demands of every person. (c) In his plea defendant alleges the general conclusion that he was compelled, not to testify against or criminate himself, but to testify. This might be true, and still his constitutional rights have not been infringed, and the facts set out in the plea disclose the same condition. After he appears, either voluntarily or in obedience to a subpoena, and is sworn, his constitutional guaranty is then available. He may decline to testify, or like any other personal privilege, he may voluntarily waive it. If he asserts his privilege, "how could there be compulsion or legal restraint when there is no law which could compel him to testify against himself, or punish him for refusing to testify?" Within legal contemplation it is impossible for one to be compelled to testify against himself. The plea discloses that defendant exercised his right and refused to testify against himself, and in this was sustained by the court. The questions which he did answer, according to the plea, did not furnish testimony against himself, or in any manner tend to criminate him on the charge contained in the indictment. Even if he had given such testimony, he

voluntarily answered these questions after knowing his rights, and after successfully asserting them on other inquiries, and the court can now but assume that he was not only willing, but desirous to answer. Having thus waived his right, it is too late to complain. State v. Douglas, 1 Mo. 528; People v. King, 28 Cal. 265; State v. Faulkner, 185 Mo. 694; State v. Lauder, 82 Mich. 119; State v. Lynn, 169 Mo. 671. (d) From the questions asked defendant by the grand jury and the evidence adduced on trial, it is evident that the grand jury, while investigating the bribery of Warner and Priesmeyer, first traced the marked money to the hands of defendant, and it was certainly competent and proper to call him to ascertain, if possible, where, when and from whom, and under what circumstances this bribe money came into his possession, they indulging the legal presumption that his connection therewith was innocent. There was no more impropriety in this action than in subpoenaing witness, Wiseman, who received the money from defendant, and who deposited it in the bank. All this was necessary to complete their investigation, and for them to have done less would have been censurable. Wharton, Criminal Pleading and Practice (9 Ed.), p. 36, ch. 4; 1 Chitty, Criminal Law, 318; Ward v. State, 2 Mo. 121; State v. Faulkner, 175 Mo. 570; State v. Lehman, 175 Mo. 627; State v. Hawks, 56 Minn. 139; State v. Turley, 153 Ind. 345. (2) The indictment charges with certainty and particularity all the elements and facts necessary to constitute the crime of accessory after the fact to bribery, and fully informs the defendant of the exact nature and cause of the accusation against him. State v. Miller, 182 Mo. 373; State v. Williams, 136 Mo. 294; State v. Schnettler, 181 Mo. 187; State v. Lehman, 182 Mo. 445. (3) The evidence is amply sufficient to support the verdict of guilty. It shows that defendant had knowledge of the bribery, and with such

knowledge received the money and endeavored to se-crete it in an effort to aid the principal offenders. His conduct is inconsistent with any other rational theory, and must be attributed to a consciousness of guilt. State v. Miller, 182 Mo. 386; State v. Kosky, 191 Mo. 16; State v. Guild, 149 Mo. 377; State v. Richmond, 186 Mo. 82; State v. Wigger, 196 Mo. 97.

FOX, J.—This cause is now pending in this court upon appeal on the part of the defendant, Daniel E. Naughton, from a judgment of the circuit court of the city of St. Louis, convicting him as accessory after the fact to the commission of a felony.

In the year 1907, Ferd. Warner and Fred. W. Priesmeyer were members of the House of Delegates in the city of St. Louis. The defendant was deputy clerk of said legislative body. On the 18th day of October of that year there was pending before the House of Delegates House Bill No. 212, entitled "An ordinance authorizing Henry Ascher to erect a one-story brick building to be used for an automobile garage on the rear of the premises known as 5011, 5013 and 5015 Delmar avenue, in City Block No. 4857."

The indictment against this defendant is quite lengthy, but suffice it to say that the first portion thereof in proper terms charges that the said Warner and Priesmeyer received of Henry Ascher the sum of $500 to vote for and put through such measure in the House of Delegates. After thus charging the crime of bribery against Warner and Priesmeyer, as to the defendant, the indictment thus specifies the charge against him: "And that afterwards, to-wit, on the 19th day of October, A. D. 1907, at the said city of St. Louis and State of Missouri, one Daniel E. Naughton, then and there well knowing the said Ferd Warner and the said Fred W. Priesmeyer to have committed the aforesaid bribery and felony in the manner and form aforesaid; and he, the said Daniel

E. Naughton, then and there not standing in the relation of husband and wife, parent or grandparent, child or grandchild, brother or sister, by consanguinity or affinity, to the said Ferd. Warner nor to the said Frederick W. Priesmeyer, did then and there unlawfully, knowingly and feloniously have and receive of the said Ferd. Warner and the said Frederick W. Priesmeyer the said sum of five hundred dollars, lawful money of the United States, as aforesaid, and being the same five hundred dollars so given and paid over to the said Ferd. Warner and the said Frederick W. Priesmeyer by the said Henry Ascher as a bribe as aforesaid, and did then and there unlawfully, knowingly and feloniously carry away and dispose of and attempt to conceal and make away with the said five hundred dollars in order that the same might not be found, nor be discovered nor to be used as evidence against the said Ferd. Warner and the said Frederick W. Priesmeyer and with the felonious intent then and there and thereby to aid and assist the said Ferd. Warner and the said Fred W. Priesmeyer and in order that they, said Ferd. Warner and the said Frederick W. Priesmeyer, might escape and avoid trial, conviction and punishment for the said offense of bribery and felony committed by them as aforesaid; contrary to the form of the statute in such case made and provided and against the peace and dignity of the State.''

This indictment was returned at the October term, 1907, of the St. Louis Circuit Court, that is to say, February 1st, 1908.

To this the defendant filed his duly verified plea in abatement thereto, in the language following:

''And the said Daniel E. Naughton, in his own proper person, comes into court here and having heard the said indictment read, says that the State ought not further to prosecute the said indictment against him, the said Daniel E. Naughton, because he

says on or about the 4th day of December, 1907, he was subpoenaed as a witness to appear and did appear as a witness before the grand jurors of the State of Missouri summoned and impaneled for the December term, 1907, of the circuit court of the city of St. Louis, Missouri.

"That said grand jurors were then and there investigating the charge against him, Daniel E. Naughton, of accessory after the fact to the alleged bribery of Ferd. Warner and Fred. W. Priesmeyer, members of the House of Delegates of the city of St. Louis, Missouri.

"That he was sworn as a witness and was compelled to testify and did testify in the matter of the said investigation, without being informed that his own conduct was under investigation. That afterwards, to-wit, on the 6th day of December, A. D. 1907, he was brought before the Honorable Daniel D. Fisher, judge of this court, and arraigned for a criminal contempt for his failure to answer in substance the following questions:

" 'Q. Did you take five hundred dollars in currency to the place of business of Sam Weisman, of this city, and give him, the said Sam Weisman, the said five hundred dollars in currency, October 19, 1907, in the city of St. Louis, Missouri?

" 'Q. Who gave to you the said five hundred dollars in currency which you took to the said place of business of Sam Weisman of this city on the 19th day of October, 1907?

" 'Q. Did you get five hundred dollars from any member of the House of Delegates, or any officer of the House of Delegates or any other person on the night of the 18th of October, 1907, or at any time the next day?

" 'Q. Did you, directly or indirectly, receive five hundred dollars from Fred W. Priesmeyer or

Ferd. Warner in the city of St. Louis, Missouri, on the 18th day of October, 1907, or at any time thereafter?

" 'Q. Did you directly or indirectly receive from Fred. W. Priesmeyer or Ferd. Warner an envelope or any other package or parcel in the city of St. Louis, on the 18th day of October, 1907, or at any time thereafter?

" 'Q. Did you receive from any person or persons in the city of St. Louis, Missouri, the sum of five hundred dollars, October 18th, 1907, or at any time thereafter?

" 'Q. Do you know whether or not any person or persons delivered to Sam Weisman the sum of five hundred dollars in the city of St. Louis, Missouri, October 18th, 1907, or at any time thereafter?'

"To each and every one of the said questions defendant refused to answer.

" 'Q. Did you receive any money on the night of the 18th day of October, 1907, from any member of the House of Delegates or any other person, knowing at the time or having reason to believe at the time that the money, to-wit, the five hundred dollars, was in any sense connected with a bribery transaction or any other criminal act? A. I did not, sir.'

"That he was discharged by this honorable court. That afterwards, on or about the 9th and 10th days of December, 1907, he was again subpoenaed as a witness before said grand jurors and did appear before them and was again examined concerning the said charge against him of accessory after the fact to bribery, without being informed that his case was under investigation. That he was again on the 11th, 12th and 14th days of December, A. D. 1907, subpoenaed as a witness before said grand jurors and did appear before them and was again examined as a witness and did again testify in said case of the State of Missouri v. Daniel E. Naughton, charged with said offense of being accessory after the fact to

bribery, without being informed that his own case was under investigation.

"That thereafter, to-wit, on February 1st, 1908, said grand jurors, before whom defendant appeared and testified, as aforesaid, found, returned and filed the indictment herein against him. And this he, the said Daniel E. Naughton, is ready to verify.

"Wherefore, he prays judgment and that by the court herein he may be dismissed and discharged from the said premises in said indictment above specified."

The State pleaded to this plea in abatement by way of general denial.

On hearing of this plea the defendant introduced all of the testimony of Naughton before the grand jury on December 3d, or December 11, 1907. It was admitted that defendant had been duly subpoenaed to appear before the grand jury; that he attended the ante-room of the grand jury room ten times in obedience to subpoenaes and testified two different days; that no warning was given defendant that he was under investigation.

While we dislike very much to burden this opinion with a detailed statement of the defendant's testimony before the grand jury, yet to fully appreciate the proposition confronting us concerning the action of the court upon the plea in abatement, it is absolutely essential that the examination of the defendant before the grand jury be reproduced, to the end that we may be able to intelligently discuss the highly important proposition as to whether or not the trial court committed error in the overruling of defendant's plea. The examination of the defendant before the grand jury, as contained in the record, is as follows:

"December 3rd, 1907.

"Daniel E. Naughton, of lawful age, being first duly sworn according to law, testifies:

"Q. What is your name? A. Daniel E. Naughton.

"Q. Where do you reside? A. 1509 O'Fallon street.

"Q. Married or single? A. Married.

"Q. How old? A. 33 past.

"Q. What official position, if any, do you hold in the city of St. Louis? A. Assistant clerk of the House of Delegates.

"Q. For how long? A. Since April.

"Q. 1907? A. Yes, sir.

"Q. Do you know Mr. Weisman, the gentleman who just preceded you in the grand jury room? A. I do, sir.

"Q. Did you give Sam Weisman $500 on the 19th day of October, 1907, or at any other time? A. I refuse to answer on the ground that I might incriminate myself. The answer might lead to evidence or an indictment.

"Q. Well, if you did give him $500 on the 19th of October, 1907, or at any other time, did you receive that money from any member of the House of Delegates? A. I refuse to answer on the same grounds.

"Q. Will you tell the grand jury from whom you got that money? A. I refuse to answer on the same grounds.

"Q. Will you tell the grand jury how it would incriminate you? A. I refuse to answer on the same grounds.

"Q. You are an officer of the city government? A. Yes, sir.

"Q. In the pay of the citizens of the city of St. Louis? A. Yes, sir.

"Q. What is your salary? A. $150 per month.

"Q. What are your duties? A. Assistant Clerk.

"Q. Did you receive $500 on the night of the 18th of October, 1907, from anybody? A. I refuse to answer on the same grounds.

"Q. Did you receive $500 any time on the 19th day of October, 1907? A. I refuse to answer on the same grounds.

"Q. If you gave Sam Weisman $500 on the 19th day of October, 1907, or at any other time, did you have any knowledge that it was bribe money or directly or indirectly connected with any criminal transaction? A. I refuse to answer.

"December 11, 1907.

"Daniel E. Naughton, of lawful age, being first duly sworn on his oath according to law, deposeth and saith:

"Q. Your name is Daniel E. Naughton? A. It is, sir.

"Q. You remember being before this grand jury on another case? A. Yes, sir.

"Q. You were before the former grand jury, were you not? A. Yes, sir.

"Q. How long have you lived in St. Louis? A. All my life.

"Q. How old are you? A. Thirty-three, past.

"Q. What was your business before you went into the House of Delegates? A. I formerly was connected with a saloon on Olive street.

"Q. What was the name? A. Oriental.

"Q. Was there a dance hall connected with it? A. There was.

"Q. Where was it located? A. 2320 Olive.

"Q. How long were you in business there? A. About six or seven months. I can't remember—my license was revoked.

"Q. When was it revoked? A. The last time?

"Q. Yes. A. I think January 5th, 1906.

"Q. You in any other business now, Mr. Naughton, except that official position? A. I was managing a dancing pavilion at Klausmann's Cave.

"Q. You still connected with it? A. I am, sir.

"Q. Who is the proprietor? A. I don't know.

"Q. Who employed you? A. I pay Mr. James Ashton.

"Q. You rent the pavilion and run it yourself? A. Yes, sir, me and Mr. Hendricks.

"Q. Who is Mr. Hendricks? A. He is a professor of piano.

"Q. You are operating at this time of the year? A. No, sir, closed in October.

"Q. Have you a lease for next year? A. No, sir, no arrangements made.

"Q. You lived here, you say, thirty-three years? A. Yes, sir.

"Q. That is your life time? A. Yes, sir.

"Q. Where were you born in St. Louis? A. I don't know.

"Q. Were you ever arrested for any felony in your life? A. Well, I was arrested, Mr. Sager, for petty larceny.

"Q. That took you in the Court of Criminal Correction? A. Yes, sir.

"Q. What became of your case? A. Discharged on hearing.

"Q. How long was that? A. I disremember— Judge Moore was on the bench and Mr. Dalton was prosecuting attorney—previous to that Mr. Sager— why there—was Hancock up here then?

"Q. Yes, sir. A. Well, he has indictments against me for running a saloon—for selling liquor on Sunday—I was tried there by a jury, and it was dismissed, sir.

"Q. Were you ever in the Court of Criminal

Correction at any other time on any other matter as a defendant? A. No, sir.

"Q. Were you ever arrested in any other case? A. Disturbing the peace.

"Q. A number of times? A. Not a number of times.

"Q. Two or three times? A. Yes, sir.

"Q. Well, don't you recall that you had been in the Court of Criminal Correction a great many more times than that, Mr. Naughton?. A. On charges?

"Q. Yes. A. I don't recall any more, Mr. Sager. These indictments and this petty larceny.

"Q. I have twenty-eight cases here? A. Well, there were twenty-six cases in this one saloon.

"Q. Employment of females in a dance hall? A. Yes, sir.

"Q. You remember the petty larceny case you were discharged in and the disturbing of the peace you were fined $5. A. In this court?

"Q. That is what it says here? A. I was fined five dollars in the Dayton Street Police Court and I took an appeal and it was discharged—that happened in election time. That was the time I was arrested, I appealed from Jefferson and Dayton—Sergeant Collins, I think was his name.

"Q. You never, except for these matters, you never were in any more serious trouble than this? A. No, sir.

"Q. How many years were you engaged in the saloon business? A. I was not directly connected with the saloon; Mr. O'Donald has the place, 2322. I was working for the city. I never got any benefits for it. But the people thought I was. Mr. O'Donald and I were very good friends, and when he wanted to go into the saloon business, I went to a friend of mine and he went to Mr. Stifel and he got him the

saloon. I was 'working in the assessor's office at the time.

"Q. How long have you been holding a city position? A. Under Mr. O'Brien and this present position. The term before this last election.

"Q. You remember when you were before the last grand jury you were asked about your knowledge of any criminal transaction connected with the sum of five hundred dollars and you stated so far as you know you never heard of or knew anything of that alleged bribery transaction in which it is alleged that Asher paid the sum of five hundred dollars to a member of the House of Delegates? A. I refuse to answer on the grounds that it might incriminate me, the answer at the present time may lead to an indictment later on. I stand on my constitutional rights.

"Q. Well, you have already testified to that? A. Any question that leads up to that I refuse to answer on the same grounds.

"Q. You can't do that—you already answered some questions before the last grand jury: 'Do you know or have you ever heard of any member of the municipal assembly accepting any money or other valuable consideration from any one to influence their vote or official action on any matters pending before the House?' and you answered that you had not, sir. Is that correct? A. I refuse to answer on the same grounds.

"Q. Will you answer whether or not you made such an answer to the last grand jury? A. I refuse to answer that on the ground that it may tend to incriminate me and the answer may lead to an indictment later on, and I stand on my constitutional rights.

"Q. 'Do you know of any sum of five hundred dollars that was transferred on the evening of October the 18th or on the morning of the 19th, 1907?'—

you remember answering that question? A. I refuse to answer that question on the same grounds.

"Q. Will you answer that question now? A. I refuse to answer that question on the same grounds.

"Q. You remember who was present at the House of Delegates chamber on the evening of the 18th of October, 1907? A. I refuse to answer that question on the ground that it may tend to incriminate me, and the answer may tend to follow with an indictment later on, and I stand on my constitutional rights.

"Q. Who taught you that answer? A. That is a privileged question and I refuse to answer on the same grounds.

"Q. You remember the day the case against Warner and Priesmeyer was set—you remember that it was set? A. Yes, sir.

"Q. Where were you at that time? A. The day of the trial?

"Q. Yes, sir. A. Part of the day I was in Cincinnati and part in Indianapolis.

"Q. When did you leave the city? A. I left Friday preceding that—Friday night.

"Q. What did you go to Cincinnati for? A. To transact a little business I had over there.

"Q. Did you go there to avoid service? A. I never was served.

"Q. Did you know that this case had been disposed of before you got home? A. I did not.

"Q. Did you ever in your life have in your possession five hundred dollars or any other sum of money that you knew to be or had reason to believe had any connection with any unlawful or criminal transaction? A. I refuse to answer that question on the ground that it might tend to incriminate me and the answer may tend to follow with an indictment later on, and I stand on my constitutional rights.

"Q. Will you tell this grand jury whether or not you made any such statement to the former grand jury, to-wit—that you did not know of any bribery transaction in the House of Delegates and that you did not know of any money being passed or any bribery being proposed on the Ascher bill? A. I refuse to answer on the same grounds.

"Q. You won't tell this grand jury—because we want to get along—will you tell this jury what you told the last grand jury? A. I refuse to answer on the same grounds.

"Q. That is not fair. I am asking whether or not you will answer or agree to answer— A. I refuse to answer any question leading up to this case on the ground that the answer may tend to incriminate me and the answer may tend to later follow with an indictment and I stand on my constitutional rights.

"Q. Have you ever been advised that you have committed any crime in connection with this matter? A. I refuse to answer on the same grounds.

"Q. You think it possible for you to be indicted for any crime in any way directly or indirectly with this bribery transaction? A. I refuse to answer on the same grounds.

"Q. You will refuse to answer question that you made before the last grand jury? A. I refuse to answer on the same grounds.

"Q. You want to answer questions that you did answer? A. I refuse to answer on the same grounds.

"Q. Will you tell this grand jury in what way it would be possible for you to incriminate yourself if you answered these questions truthfully? A. I refuse to answer on the same grounds.

"Q. Any question, Mr. Foreman?

"Q. You believe that any answer you made

could possibly incriminate you? A. I refuse to answer on the same grounds.

"Q. Do you believe that any answer you might give to any question asked you either before this or the preceding grand jury could in any way directly or indirectly involve you in a criminal transaction? A. I refuse to answer the question, it might incriminate me, and the answer may tend to later follow with an indictment; I stand on my constitutional rights.

"Q. Where were you on the night of the 18th of October? A. I refuse to answer on the same grounds.

"Q. Were you at the place of your official duty, to-wit, in the chamber of the House on that night? A. I refuse to answer on the same grounds.

"Q. Were you in the city of St. Louis on the night of October 18th, 1907? A. I refuse to answer on the same grounds.

"Q. Did you see Sam Weisman on the 18th day of October? A. I refuse to answer on the same grounds.

"Q. Did you see Ferd. Warner or Fred. W. Priesmeyer on the night of the 18th day of October, 1907? A. I refuse to answer on the same grounds.

"Q. Did you go into the public toilet room of the city hall at any time after seven o'clock on the evening of the 18th day of October, 1907? A. I refuse to answer on the same grounds.

"Q. Did you have any conversation with Ferd. Warner or Fred W. Priesmeyer in the cloak room or in the committee room of the House of Delegates on the evening of October 18th, 1907? A. I refuse to answer on the same grounds.

"Q. Did either Ferd. Warner or Frederick W. Priesmeyer give you a package of five one hundred dollar bills or five hundred dollars in any other denominations or any other sum of money on the even-

State v. Naughton.

ing of the 18th day of October, 1907? A. I refuse to answer on the same grounds.

"Q. Did William P., *alias* "Sport" Brady, sergeant-at-arms of the House of Delegates, give you any money on the evening of the 18th of October, 1907? A. I refuse to answer on the same grounds.

"Q. Do you know of a combine existing in the House of Delegates who were banded together for the purpose of securing money for the passage of bills in the House of Delegates? A. I refuse to answer on the same grounds.

"Q. Have you been a member of any conspiracy formed among the officials of the House of Delegates for the purpose of holding up legislation to demand money for the passage of such legislation? A. I refuse to answer on the same grounds.

"Q. Are you a married man? A. Yes, sir.

"Q. Aren't you afraid that would incriminate you? A. I refuse to answer.

"Q. Have you ever been bribed in your life? A. I refuse to answer on the same grounds.

"Q. Did you ever steal five hundred dollars? A. I refuse to answer on the same grounds.

"Q. Did you ever find five hundred dollars any place in the city hall of the city of St. Louis on the evening of October 18, 1907? A. I refuse to answer —same grounds.

"Q. Did you find five hundred dollars at any place on the evening of the 18th of October? A. I refuse to answer on the same grounds.

"Q. Ever find anyone on the 19th of October? A. I refuse to answer on the same grounds.

"Q. Ever find five hundred dollars in your life? A. I refuse to answer your question on the same grounds.

"Q. You refuse to swear to this grand jury that

221 Sup—27

you believe that your answers could incriminate you? A. I refuse to answer on the same grounds.

"Q. We just want to have you go on record that you do believe it? A. I refuse to answer your question on the same grounds.

"Q. Did you furnish this testimony to the former grand jury? A. I refuse to answer your question on the same grounds as Mr. Sager's.

"Q. You are a good loyal citizen of St. Louis? A. I judge I am.

"Q. You believe in St. Louis? A. I believe I do.

"Q. You would like to see the city prosper and grow? A. I guess I would.

"Q. Now then, that being the case, don't you think your position here—we are just simply trying to do our duty and are trying to break up what we are informed has been a very corrupt matter, and we want loyal citizens to help us— A. Any question that you put up to me that tends up to this question may tend to incriminate me. I will refuse to answer anything that may lead to this question. I will refuse to answer, the answer may lead to an indictment later on—I stand on my constitutional rights.

"Q. If this grand jury would assure you and I personally assure you there would be no prosecution of you, would you answer? A. I refuse to answer.

"Q. Did the man who told you to make that answer discuss this matter with you? A. That is a privileged question—I refuse to answer.

"Q. Did you employ an attorney in this matter? A. I refuse to answer.

"Q. Did you ever agree to pay an attorney a fee in this matter? A. I refuse to answer on the same grounds.

"Q. In what manner do you deem this question

to be a privileged question? A. I refuse to answer your question.

"Q. You already stated to a preceding grand jury that you had no knowledge of any criminal transaction? A. I refuse to answer that question because it may tend to incriminate me. The answer may lead to an indictment later on—I stand on my constitutional rights."

By a reading of this examination it will be observed that at one point the circuit attorney said to the foreman of the grand jury: "Any question, Mr. Foreman?" whereupon follows a most rigid examination of the defendant by the foreman of the grand jury.

The record discloses that Warner and Priesmeyer were indicted in October; there was a *nolle prosequi* entered as to said bill and they were again indicted on the 5th of December, 1907; that is to say, the second indictment as to them was filed with the clerk of the court on that date, so that when the defendant in this case was called before the grand jury on December 11th, the grand jury clearly had under consideration the charge afterward prepared against him.

At the close of the evidence upon the plea in abatement it was submitted to the court and by the court overruled, to which action of the court defendant duly preserved his exceptions.

The trial proceeded upon the charge as contained in the indictment. Testimony was introduced upon the part of the State. We do not deem it essential to here reproduce the testimony as introduced by the State, but will fully present it during the course of the opinion. At the close of the testimony the court instructed the jury and the cause was submitted to them and they returned their verdict finding the defendant guilty of accessory after the fact of bribery and assessed his punishment at three months' imprisonment in the county jail and a fine of one hun-

dred dollars. Timely motions for new trial and in arrest of judgment were filed by the defendant, taken up by the court and overruled. Judgment was entered of record in accordance with the verdict, and from this judgment the defendant in due time and proper form prosecuted his appeal to this court and the record is now before us for consideration.

## OPINION.

The first and in our opinion the most important proposition confronting us in the consideration of this appeal is the insistence on the part of learned counsel for defendant that the action of the trial court in refusing to sustain his plea in abatement, was error, and after a most careful consideration of this record in detail upon this proposition we have no hesitancy in saying that this insistence is fully sustained by the disclosures of the record, as well as the authorities applicable to the proposition now under consideration.

This defendant was subpoenaed before the grand jury and responded to the commands of such subpoena about ten times. Manifestly at the time of the examination and the questions propounded to him before the grand jury, as herein indicated, the grand jury did not have under investigation the conduct of Warner and Priesmeyer or anyone else. At that time two indictments had been returned against Warner and Priesmeyer—the first one was dismissed and another indictment presented against them on the 5th of December, 1907, which was nearly a week prior to the time that the grand jury caused this defendant to be brought before it, at which time an examination was indulged in the equal of which cannot be found in the history of the administration of the criminal laws of this or any other country. While the representatives of the State, in their efforts to preserve the dignity of the commonwealth, should be commended, but on the other

hand they must not be so blinded by their desire for conviction as to lose sight of the constitutional rights of the defendant. This defendant was summoned to appear before the grand jury, it is conceded, about ten times, and the record before us makes it plainly manifest that the only purpose of the examination on the 11th of December, 1907, was the investigation of the conduct of the defendant himself. This is clearly disclosed by the record, and a fair and impartial consideration of the disclosures of the record can result in but one conclusion, and that is, as before stated, that the grand jury was seeking to investigate the conduct of the defendant himself. If the defendant was brought before the grand jury for the purpose of investigating his conduct, the inquiry might very appropriately be made as to what was the purpose sought? Manifestly he was not before the grand jury for the purpose of testifying upon charges against Warner and Priesmeyer. Indictments had been returned against those defendants a week previous to this time. The examination as herein indicated, and each and every question propounded to this defendant while before the grand jury, leave no doubt as to the purpose of that examination and furnishes a complete answer to the inquiry as to why he was brought before the grand jury and subjected to such an unprecedented examination.

As was said in the case of State v. Faulkner, 175 Mo. l. c. 611: "It is intolerable that one whose conduct is being investigated for the purpose of fixing on him a criminal charge should, in view of our constitutional mandate, be summoned to testify against himself and furnish evidence upon which he may be indicted. It is a plain violation both of the letter and spirit of our organic law. Such a practice cannot be too strongly condemned and scrupulously avoided by those entrusted with the administration of the criminal law."

To sustain the contention of the State upon this proposition would simply be an indorsement and approval of the violation of the mandates of the organic law of this State, as well as doing violence to every sense of decent and orderly proceeding in the courts of the country.

It does not furnish a solution of the proposition now under consideration by reason of the unprecedented action of the inquisitorial body in the city of St. Louis, to say that this is the only way to deal with the criminal classes in large cities who are deeply steeped in crime. It matters not how deeply steeped in crime a citizen of this State may be, he has certain constitutional rights which cannot and ought not to be ignored, and it must not be forgotten that the rules of law and proper criminal procedure are applicable alike to all subdivisions of the State, whether large cities or small towns and villages. The criminal proceeding can never be so extreme as to justify those who are to administer the criminal laws of the State to disregard the sacred mandates of the Constitution. That instrument not only protects the citizen accused of crime, but its force and power should be sufficient to stay the efforts of any one who would attempt to violate it.

In section 23 of article 2 of our Constitution is found the language, "That no person shall be compelled to testify against himself in a criminal cause." The investigation of a crime before a grand jury falls within the term "criminal cause."

In 20 Cyc. 1348, it is said: "Constitutional provisions declaring that no person in a criminal case shall be compelled to be a witness against himself are very generally applicable to witnesses summoned before a grand jury, and an indictment based on evidence secured in violation of this constitutional guaranty will as a general rule be deemed invalid. But

this rule does not apply where the accused testifies voluntarily or waives his privilege.''

In United States v. Edgerton, 80 Fed. 374, the court had under consideration the exact point we have here. There the defendant challenged the validity of the indictment upon several different grounds, among which were two considered by the court: (1) the alleged presence of an unauthorized person in the grand jury room, and (2) ''the examination of the defendant, Edgerton, as a witness against himself, under compulsion of a subpoena.'' Touching the latter question, the court said:

''It is fatal to the indictments that the defendant was called to testify in the particular matter from which they resulted, without being informed or knowing that his own conduct was the subject under investigation. In the case of United States v. Brown, 24 Fed. Cas. No. 14671, it is held that there is no such thing as a criminal action or proceeding within the meaning of the Oregon statutes, which protects a defendant in a criminal case from testifying against himself, until an indictment has been filed in court, and that the examination of a person before the grand jury, although such an examination tends to connect him with a criminal offense, is not the investigation of a 'criminal charge.' But the Supreme Court of the United States, in Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. Rep. 195, holds otherwise. There it is held that under the fifth amendment to the Constitution of the United States, which declares that no person shall be compelled in any criminal case to be a witness against himself, an examination of a person before the grand jury in an investigation into certain alleged violations of the Interstate Commerce Act, where his testimony might tend to criminate him, constitutes a 'criminal case' within the meaning of the constitutional provision. The adjudged cases in both the Federal and State courts are fully reviewed in

the opinion. It makes no difference, in my judgment, that the case was one where the witness declined to answer, and the question decided was raised on *habeas corpus* proceedings to release him from imprisonment for contempt in such refusal. The court holds, upon obvious principles, that the constitutional provision referred to, as well as the like provisions adopted by the various States, must have a liberal construction for the protection of personal rights. Neither evasion nor subterfuge can be permitted to destroy them.

"It is argued that it must be made to appear that the defendant has suffered injury in what has been done, before the objection that is made can be sustained. This is true as to technical requirements and formalities, but not as to matters of substance. Where a witness is compelled to testify against himself, the injury inheres in the violence done to his rights. It is not susceptible of proof, nor the policy of the law to require it, and the injury done to the public in such case outweighs that suffered by the defendant. It is a matter of the highest public policy that crime shall be punished by legal methods. When these are disregarded, there is the mob, between which, in the pursuit of vengeance, and the officers of the law, acting in its name, but in disregard of it, there is no distinction."

This case has received approval by several courts, and among them our own, in the case of State v. Faulkner, 175 Mo. l. c. 610-611. In the Faulkner case, GANTT, P. J., said: "One other case, not in the printed brief, is United States v. Edgerton, 80 Fed. 374. This is a case in the district court of Montana. The decision was made on a motion to quash an indictment, first, because one Flynn, an expert witness, was permitted to remain in the grand jury room and hear the testimony of other witnesses and examine them; second, because, while investigating the offense for which defendant was indicted, he was called as a witness before

the grand jury to testify as to that offense, without being informed or knowing that his own conduct 'was the subject under inquiry. The court quashed the indictment on both grounds and for other reasons also it would appear. While not the opinion of a court of last resort, the case appears to have been well decided. It is in line certainly with the reasoning upon which the other cases cited depend. It is intolerable that one whose conduct is being investigated for the purpose of fixing on him a criminal charge should, in view of our constitutional mandate, be summoned to testify against himself and furnish evidence upon which he may be indicted. It is a plain violation both of the letter and spirit of our organic law. Such a practice cannot be too strongly condemned and scrupulously avoided by those entrusted with the administration of the criminal law, but it is obvious at a glance that this case, like all others cited, does not meet the question before us.'' And in discussing a refused instruction in the Faulkner case, Judge GANTT, upon the subject now in hand, further said:

''It is obvious that there are at least two, if not three, distinct legal propositions involved in this instruction. The first is an old and time-honored maxim of the common law, '*Nemo tenetur seipsum accusare.*' (No one shall be compelled to accuse himself.)

''As said by Judge BARCLAY in State ex rel. Attorney-General v. Simmons Hardware Company, 109 Mo. 125-6, 'To fully grasp its meaning we must note its place in the history of the law as one of the most important of the rules of procedure that express the fundamental difference between the criminal practice prevailing in continental Europe, and that of countries which trace their law, as we do, to the English source. In the former, the accused is required to submit to a rigid official examination touching the charge against him. In the latter such an examination is positively forbidden. The reason of this difference is

found in that higher regard for the personal rights of the individual citizen, which obtains in countries following the English common law, and to which is traceable the growth of that independent spirit which has secured to the people of those countries so large a share of liberty and placed them in the vanguard of the world's progress.'

"In Missouri it forms one of the sections of our Bill of Rights, our organic law: 'No person can be compelled to testify against himself in a criminal cause.' In every State of the Union a similar provision is found in its Constitution. It is also firmly embodied in the Constitution of the United States. The courts have jealously enforced it in all cases in which it was properly invoked. Mr. Justice BRADLEY, in Boyd v. United States, 116 U. S. loc. cit. 631, voiced the sentiment of all American courts and lawyers when he said: 'Any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom.'

"In our own jurisprudence, from the first volume of our reports down to the last, the same principle has been fearlessly announced and adhered to. It is not to be abandoned to subserve the exigencies of any particular prosecution. Constitutional safeguards which have resisted the assaults of monarchial power in England for centuries, and withstood momentary clamor in this country throughout our national existence, are not to be frittered away at the demand of those who have apparently studied the fundamental principles of our free institutions to little advantage, when they demand that this universal principle of the

common law and this constitutional guaranty of our Federal and all the State constitutions shall be abrogated because it may prove an inconvenient barrier to the investigation of some flagrant crime or crimes. It was framed by JAMES MADISON as it appears in the Federal Constitution, and no American statesman or lawyer has ever advocated its repeal.

"So far as this instruction announces this obvious and just principle of law, it is unquestionably correct, but its application to the facts of this case is another matter." Judge GANTT then distinguishes the Faulkner case from such cases as the one at bar: "But the point we are to determine is whether a witness, not under arrest for a crime, and summoned before a grand jury in the investigation of the guilt of others, can fail to claim his privilege or waive it, and testify falsely, and be absolutely exempt from a prosecution for perjury for such false swearing. The proposition reduced to its last analysis is, that as no person can be compelled to testify against himself, he may waive his privilege, testify *falsely,* and yet incur no liability for perjury. In another form it may be stated that since he cannot be compelled to incriminate himself, and as by testifying *falsely* he does not incriminate himself by committing perjury, therefore, he cannot be prosecuted for it."

And such was the Faulkner case. The grand jury was investigating Murrell and Stock and the defendant was testifying as a witness. He did not claim his privilege and of course if he spoke at all he must speak truly or otherwise violate the oath which he had taken. All the Faulkner case holds, although cited by the State in this case, is that if a witness fails to claim his privilege and testifies falsely, he can be tried for perjury. But that is not the issue here. The question here is, can the State trample underfoot the Constitution and yet cling to an advantage thus unlawfully and wrongfully gained?

The Edgerton case is also approved in the recent case of State v. Gardiner, 88 Minn. 130. One of the questions answered by Start, C. J., in the Gardiner case, is thus stated: "Was it error to deny the defendant's motion to quash the indictment on the ground that he was compelled to give testimony before the grand jury touching the charge alleged in the indictment?" Answering this question the court argues with much force the position which we take in the case at bar. The learned chief justice thus speaks:

"The defendant's name was not indorsed on the indictment as a witness. The only names thereon were those of William Edwards and Lincoln G. Grossman. The defendant also, in connection with his motion, moved the court to direct the production of the minutes of the grand jury. There was no traverse by the State of the affidavit upon which the motion was based. The trial court refused to direct the production of the minutes, and denied the motion. The ground for the decision of the court does not appear from the record except by inference. It is certain from the record that the motion was not denied because the alleged facts therein stated were untrue, for they were not denied by the State, and the court could not have assumed that the affidavit was false, for the defendant then stood fair before the court, presumed to be innocent of the charge made against him in the indictment. The only conclusion that can be drawn from the record is that the motion was denied because the facts alleged in the affidavit were, as a matter of law, insufficient to call upon the court to enter upon an investigation of the merits of the charge that the defendant was subpoenaed before the grand jury, and required to give evidence against himself. This is the only ground upon which it is possible to sustain the order of the court denying the motion to quash.

"Whether the affidavit was sufficient or not was a question of law. If it was, the motion should have

been granted, the State having declined to traverse it; but, if it was not, the court had no discretion in the premises, as counsel for the State seems to claim. If in fact the defendant was compelled to be a witness against himself before the grand jury, it was a violation of his personal right guaranteed to him by the Constitution of the State, which provides that no person in a criminal case shall be compelled to be a witness against himself. If such were the case, it was the imperative duty of the court to grant his motion to quash the indictment, for courts have no discretion in the matter of giving effect to constitutional guarantees. [State v. Froiseth, 16 Minn. 296; Boyd v. U. S., 116 U. S. 616, 6 Sup. Ct. 524; Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195; U. S. v. Edgerton (D. C.), 80 Fed. 374.]

"The fact that the defendant's name was not indorsed on the indictment as a witness does not impair his right to have the indictment quashed if in fact he was compelled to be a witness against himself, for his right in this particular could not be evaded by the easy subterfuge of omitting his name as a witness from the indictment. The case of State v. Hawks, 56 Minn. 129, does not hold to the contrary. Counsel for the State in their brief, urge that 'a perusal of the testimony of the defendant given on the trial will show that no person could have been indicted upon it.' This is not significant, for it cannot be possible that a person may be compelled to be a witness against himself before the grand jury, and that his motion to quash the indictment for that reason may be denied, with no means of redressing the error unless on his trial he voluntarily gives evidence which justifies the indictment against him.

"It is further claimed by them that the indictment was found upon the testimony of Edwards and Grossman. This, however, if true, affords no good reason why the defendant's motion was not heard on the mer-

its. The constitutional guaranty is, not that no person shall be compelled to give evidence against himself which is made the basis of an indictment against him, but it is that he shall not be compelled to be a witness against himself. This constitutional guaranty must receive a liberal construction, to the end that personal rights must be protected. It was not necessary for the defendant to show that he had been in fact injured, for, as was well said by the court in the case of United States v. Edgerton, *supra*: 'Where a witness is compelled to testify against himself, the injury inheres in the violence done to his rights. It is not susceptible of proof, nor the policy of the law to require it; and the injury done the public in such case outweighs that suffered by the defendant. It is a matter of the highest public policy that crime shall be punished by legal methods.' Better an occasional miscarriage of justice than that the constitutional rights of the meanest man should be disregarded.

"The constitutional guaranty not only protects a person from being compelled to give direct evidence tending to establish his guilt, but also from giving any circumstance or link in the chain of evidence which may tend to convict him of a crime. It is a reasonable construction to hold that it protects a person from being compelled to disclose the circumstances of his offense, the source from which or the means by which evidence of its commission or of his connection with it may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him. For all practicable purposes, such disclosures would have the effect to furnish evidence against the party making them. They might furnish the only means of discovering the names of those who could give evidence concerning the transaction, an instrument by which a crime was perpetrated, or even the *corpus delicti* itself. Both the reason upon which the rule is founded and the terms on which it is ex-

pressed forbid that it should be limited to confessions of guilt, or statements which may be proved in subsequent prosecutions as admissions of facts sought to be established therein. [Emery's Case, 107 Mass. 172, 182.]''

In State v. Froiseth, 16 Minn. 1. c. 298, the court, speaking of the question that the defendant had been subpœnaed and testified before the grand jury, says: ''The first question presented is whether the fact that the defendant was required by the grand jury to testify, and in pursuance of such requisition did testify before that body, touching the charge and matters set forth in the indictment vitiates the indictment. It is conceded by the Attorney-General that this objection is fatal to the indictment. We think there can be no doubt upon the question. The Bill of Rights expressly declares that 'no person . . . shall be compelled in any criminal case to be a witness against himself.' [Const., art. 1, sec. 7.] The statute of this State, which provides that, 'on the trial of all indictments, complaints, and other proceedings against persons charged with the commission of crimes or offenses, the person so charged shall, at his request, but not otherwise, be deemed a competent witness; Gen. Stat. ch. 73, sec. 7, as amended Sess. Laws 1868, ch. 70, whatever may be its effect, certainly does not take away or impair the rights declared and secured to all persons by the Bill of Rights. The objection is therefore fatal to the indictment.''

Along the same line is United States v. Farrington, 5 Fed. 1. c. 348, wherein the court says: ''In State v. Froiseth, 16 Minn. 298, it was conceded by the Attorney-General, and the court concurred, that where the grand jury required an accused person to be brought before them and testify touching the accusation, the indictment should be set aside, although in that case the indictment was not found solely upon the testimony of the accused. In People v. Briggs,

Albany County Oyer and Terminer, OSBORNE, J. (MS.), held that an indictment should be quashed where the defendant's wife was called as a witness against him by the grand jury, for the reason that this was a substantial error, and it was doubtful whether the grand jury would have found an indictment without the wife's testimony. These authorities are in point here. The motions to quash the indictments are granted."

In a New York case, People v. Singer, 18 Abbott's N. C. 97, BARTLETT, J., says: "The suggestion is made that the grand jury sent for this prisoner in the exercise of the powers conferred upon them by this section. There is nothing to indicate that they did. Furthermore, the privilege of a defendant in a criminal case to testify in his own behalf is one which cannot be forced upon him. If he becomes a witness, it must be by his own act, voluntarily and without constraint put upon him by any officer or agency of the law. That this is the rule in criminal trials, there can be no doubt. In my opinion, a no less stringent rule is applicable to the investigation of a charge against a particular person by a grand jury. The power of the grand jury to cause explanatory evidence to be produced, if they believe it is within reach, must be exercised with reference to the limitation that so far as the accused person is concerned, against whom complaint is made before them and against whom their inquiry is directed, he should not even be required to attend as a witness before them, unless of his own free will, best made certain by his own request. It is not pretended that the appearance of this defendant before the grand jury was in any sense voluntary on her part. It is true she was cautioned by the district attorney as to answering, but there could have been no reason evident to her why she should heed this advice, rather than respond to the interrogatories of the grand jurors, who were apparently invested with

equal authority.  It was not necessary that her statement should be under oath to bring it within the purview of the Bill of Rights.  A mere admission is enough.  [Boyd v. United States, 116 U. S. 616.]  I am satisfied, upon a careful consideration of all the circumstances, that this prisoner was compelled by the grand jury to give evidence against herself before that body when it was investigating a charge of crime against her, and that the indictment should be quashed on that ground.  No precedent has been cited, nor am I aware of any, for the action of the grand jury in thus subjecting an accused prisoner to interrogation. The practice is too dangerous to sanction without express legislative authority.  'We have no right,' said Lord CAMDEN, 'without an act of Parliament, to adopt a new practice in the criminal law, which was never yet allowed from all antiquity.'  [Entick v. Carrington, 19 Howell's St. Tr. 1029.]  The duty of the courts to be watchful of the constitutional rights of the citizen, and to guard against stealthy encroachments thereon, is emphasized by the Supreme Court of the United States in the Boyd case (already cited).  Of the course pursued by the grand jury in the present case, we may well say what Mr. Justice BRADLEY said there:  'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, by silent approaches and slight deviations from legal modes of procedure.  This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.  A close and literal construction deprives them of half their efficacy and leads to gradual depreciation of the right.'  The indictment must be quashed, and the case must be resubmitted to another grand jury—if possible, that now in session.''

221 Sup—28

And in People v. Briggs, 60 How. Pr. 17, an indictment for murder was quashed because the defendant's wife was subpoenaed before the grand jury and there testified.

In the case of People v. Haines, 1 N. Y. Supp. 1. c. 55, the court, citing People v. Singer, supra, and other cases, said: "This is a motion to set aside an indictment found in this court on the 16th day of April, 1888, against the above named defendant, for the crime of grand larceny in the first degree. The defendant relies upon two distinct grounds for the relief he demands: (1) That the grand jury found the indictment upon illegal evidence; and (2) that the grand jury violated his constitutional right in compelling him to attend before them as a party, and testify against himself. It appears from the indorsement upon the indictment of the list of witnesses examined before the grand jury, and also from the uncontradicted averments contained in the defendant's affidavit, that while the grand jury had under investigation the criminal charge against the defendant, he was subpoenaed to attend the grand jury, and in pursuance thereof, did attend before them without counsel, and after being duly sworn to testify and give evidence in the investigation of the charge against himself, proceeded as a party to answer material questions against himself, propounded to him by the grand jury. By reason of this action on the part of the grand jury, the defendant claims and insists—First, that the grand jury found the indictment against him upon his own testimony, which, under the circumstances, was incompetent and illegal; and, second, that his constitutional right was violated, in that he was compelled to be a witness against himself. If both or either of these grounds of objection to the indictment, are true, there can be no doubt, both upon authority and in reason, but that the same should, in some manner, be summarily disposed of, without putting the

defendant to his defense and trial thereon. The learned district attorney contends that section 313 of the Code of Criminal Procedure only provides two different grounds for setting aside an indictment, and that the defendant does not bring himself within either; and cites People v. Petrea, 92 N. Y. 128, as sustaining his contention of want of power in the court to grant defendant's motion. But it will be observed, on reading from Judge ANDREWS' opinion in the Petrea case, that he expressly holds that when the defect invades a constitutional right, the court is bound to take notice of it, although unauthorized to do so by any statute, and even, also, if a statute seems to preclude the raising of the objection. The Constitution of this State provides, in article 1, paragraph 6, 'that no person shall be compelled in any criminal case to be a witness against himself.' If the grand jury, in its investigation of the charge against the defendant, violated the letter and spirit of this constitutional provision, the indictment should undoubtedly be set aside. Bishop, in his work on Criminal Procedure, at section 113, says 'that every right of the prisoner must in some way be available to him; that a right of which the possessor cannot avail himself is practically no right whatever; from which it results that, however much the Legislature may change the forms of procedure in criminal cases, the courts must so construe its enactments as not to leave the prisoner remediless with respect to any acknowledged right.' In a similar case, where the conceded facts were not so strong in favor of the prisoner as this, Judge BARTLETT said, in granting the motion to set aside the indictment, 'that the privilege of a prisoner in a criminal case to testify in his own behalf is one which cannot be forced upon him. If he becomes a witness, it must be by his own voluntary act, and without constraint put upon him by any agency of the law; and a no less stringent rule is applicable to the investiga-

tion of a charge against a particular person by a grand jury, and defendant should not be required to attend as a witness before them unless he does so of his own free will.' In this case the defendant was taken before them by legal constraint; and made a witness in the charge against himself, which action on the part of the grand jury, Judge BARTLETT said, 'satisfied him, upon a careful consideration of the case, that the prisoner was compelled by the grand jury to give evidence against himself before that body when it was investigating a criminal charge against her, and that the indictment should be quashed on that ground.' [See People v. Singer, 5 Crim. Rep. (N. Y.) 1.] The evidence of the defendant taken before the grand jury under the circumstances stated, was clearly not only unconstitutional, but was also illegal; and inasmuch as the Code of Criminal Procedure provides that the grand jury has no right to receive any but legal evidence, which would be admissible upon the trial, upon this ground as well as the other, the indictment should be quashed.''

In the Haines case the defendant had been subpoenaed before the grand jury, and without notice to that effect had been questioned by such body.

The State contends that the plea does not aver, nor does the proof show, that the indictment was found upon defendant's testimony, and does not show that there was no other legal evidence upon which it could have been found. This contention is fully answered in the Minnesota case, supra. In that case there was other evidence upon which the indictment could have been found. The same contention was made there as is made by the State in the case at bar, but the court answered it very properly in this language: ''It is further claimed by them that the indictment was found upon the testimony of Edwards and Grossman. This, however, if true, affords no good reason why the defendant's motion was not heard on the

merits.   The constitutional guaranty is, not that no person shall be compelled to give evidence against himself which is made the basis of an indictment against him, but it is that he shall not be *compelled to be a witness against himself*.   It was not necessary for the defendant to show that he had been in fact injured, for, as was well said by the court in the case of United States v. Edgerton, supra,'' etc.   We have quoted the language from the Edgerton case herein and it is not necessary to repeat it here.   That case has received the express approval of this court, and that court put it upon the ground that ''it is a matter of the highest public policy that crime shall be punished by legal methods.''   So in this case, the question is not so much the extent of the injury to defendant, but the question, which is of far greater importance, is as to whether or not the organic law of the State has been violated and its mandates absolutely ignored and disobeyed.

The State further urges that the defendant gave no material evidence before the grand jury.   Even if this were required, before we could say that this indictment should be abated, yet the State is in error. It is not necessary that the evidence should be a direct admission of the crime, but if the defendant be required to give any evidence which might lead to other evidence which would tend to convict him, he has been compelled to testify against himself within the meaning of the Constitution.   In this case it was material to show that defendant knew the witness Sam Weisman as a link in the chain of testimony.   This admission the grand jury procured from him during the course of its ''grilling.''   It was material to show, as tending to prove guilt, that defendant fled the State.   This evidence the circuit attorney carefully elicited from the defendant.   And in the last two questions and answers set out in the plea in abatement hereinabove fully set out, damaging admissions were procured.

Other portions of the testimony might be discussed, but these sufficiently answer the contention.

We have given expression to our views upon this proposition, and after a most careful and thorough analysis of the disclosures of the record, we see no escape from the conclusion that the unprecedented examination of this defendant before the grand jury, as herein indicated, had in view but one purpose, and that was to secure such admissions from this defendant as upon them an indictment could be predicated and a conviction follow. This was a plain violation of the rights of the defendant guaranteed to him by the Constitution, and if he be ever so deeply steeped in crime, he should not be denied the right to invoke the provisions of the organic law of this State. We are unwilling to give our approval or indorsement to such a plain violation of the mandates of the Constitution of this State. It was the duty of the trial court upon the showing as made, which is fully disclosed by the record, to have sustained defendant's plea in abatement. If this sort of method in the administration of the criminal laws of this State can be maintained, then we confess that our Constitution, which every law-abiding citizen should revere, would be nothing more than a blank sheet of paper. For the error as indicated upon this proposition this cause should be reversed.

## II.

This brings us to the consideration of the second proposition confronting us in the consideration of this cause, that is, as to the sufficiency of the evidence developed upon the trial to support the finding of the jury as indicated by the verdict returned. It is clear that the foundation and basis of the crime charged to have been committed by Warner and Priesmeyer is the corrupt agreement. It is essential that this must

be shown in order to constitute an offense against
them.

Directing our attention to the charge in the in-
dictment against this defendant being an accessory
after the fact, in 12 Cyc. 192, we find a very clear state-
ment as to the essential elements of that offense. It
is there said: ''An accessory after the fact is one 'who,
knowing a felony to have been committed, receives,
relieves, comforts or assists the felon. At common law
one may be an accessory after the fact to an accessory
before the fact. It is essential to one's guilt as ac-
cessory after the fact, that the felony shall have been
actually committed by the alleged principal, and the
aid or assistance must have been given after the felony
was fully completed. To render one liable as an
accessory after the fact he must have had actual knowl-
edge at the time he relieved or assisted the principal
that the latter had committed a felony.''

All the authorities agree and the court in the
case at bar so instructed the jury that the accessory
must have had knowledge that the principal had com-
mitted the alleged felony at the time the assistance was
rendered. This was the common law and this is our
statute. In fact, our statute is but an exceedingly
awkward attempt to state the common law definition
of accessory after the fact.

Now giving to the testimony in this case its
broadest scope in the interest of the State, it shows
substantially the following state of facts: That
Ascher was interested in the passage of House Bill
212, which gave him the right to build and maintain
an automobile garage in the city of St. Louis; that
the bill had hung fire in Warner's committee for some-
time; that Ascher, through one Volmer, had been
crowding Warner to get the bill reported and passed;
that Warner asked Volmer to have Ascher come to
him personally; that Warner indicated to Ascher that
it would take money to pass it, *i. e.,* $500, and that

he, Warner, would agree to pass it for that sum; that Ascher informed the circuit attorney's office, and that office furnished five one hundred dollar bills, previously marked for identification, with which to bribe Warner; that on the night of October 18, 1907, Ascher went to the city hall and met Warner and others coming into the council meeting; that he called Warner to one side and told him that he had the money and Warner directed him to go to a certain toilet room and there would be a man there to receive it; that he went to the room as directed, and presently Priesmeyer came in and got the $500; that shortly thereafter the House of Delegates convened, the bill was favorably reported and passed, both Warner and Priesmeyer voting therefor; that thereupon they were both arrested by the police officers whilst in their seats; that just before the House of Delegates met, Priesmeyer was seen to step over to the desk where was seated Leonard, the clerk, and Naughton, the deputy clerk, and a page; no talk is shown between Priesmeyer and Naughton, and he, Priesmeyer, was there but for a moment; Warner and Priesmeyer were taken to the "four courts" and there searched and no money found; as the officers were taking Warner and Priesmeyer down the steps and out of the building Naughton called to them that they had no right to arrest them in the House of Delegates chamber while such an assembly was in session; that the next morning Naughton gave to Weisman, a tailor, with whom he had business and to whom he was indebted, the five one hundred dollar bills, saying at the time, "Keep this;" that Weisman on the same day deposited the money in a bank, where it was located by the State, and was in evidence at the trial; the State had notified the banks to watch for such bills; that Naughton left the city, and when the case of Warner and Priesmeyer was called for trial he was absent and continued to absent himself. This is the force of the State's testi-

money. This testimony standing alone would author-
ize the legitimate inference that the defendant Naugh-
ton obtained this money from Priesmeyer, but the
State introduced Priesmeyer and Warner upon the
trial of this case and they testified and made proof
of the allegations in the indictment that Naughton,
Warner and Priesmeyer were of no kin, and therefore
Naughton did not, as charged in the indictment, stand
in the relation of husband and wife, parent or grand-
parent, child or grandchild, brother or sister, by con-
sanguinity or affinity, to the said Warner and Pries-
meyer. They further positively testified that they did
not give to the defendant Naughton the five one-
hundred-dollar bills.

If it is the contention of the State that Pries-
meyer or Warner gave to this defendant the money
that he gave to Weisman, then the State is put in the
awkward attitude of saying that as to the relationship
between the defendant and Warner and Priesmeyer,
these witnesses were testifying truthfully, but as to
the fact that they did not give this money to Naughton
they are testifying falsely. In view of the testimony
of Warner and Priesmeyer introduced by the State
the inference is equally as strong that the defendant
obtained this money in some other way and not at
the hands of either Warner or Priesmeyer. In fact
the examination of this defendant before the grand
jury indicates that the State had the theory that the
defendant may have found this money in the city hall
where it had been dropped or disposed of by Warner
or Priesmeyer at the time of their arrest. Upon the
essential element of the offense with which the de-
fendant is charged, that he had knowledge or was in-
formed of the unlawful and corrupt agreement between
Ascher and Warner and Priesmeyer, the record is
absolutely silent. Not a word is shown to have passed
between Naughton, Warner and Priesmeyer, showing
or tending to show that Naughton had knowledge or

was informed of the crime committed by Warner and Priesmeyer prior to the time that Naughton gave the money to Weisman. In fact there is not the slightest evidence, so far as is disclosed by the record, either direct or circumstantial, that Naughton had any opportunity to talk to Warner and Priesmeyer concerning the corrupt agreement entered into by them with Ascher. Before Naughton can be convicted of being accessory to the crime of bribery as charged in the indictment, it must be shown, at least by some sort of substantial proof, that he had some knowledge of the unlawful and corrupt agreement between Warner, Priesmeyer and Ascher. As to any proof of this fact the record is as barren as is the desert of Sahara barren of plants and trees. Grant it that Naughton received the $500 from Priesmeyer or Warner, or either of them, does this fact, without any additional proof, authorize the indulgence of the presumption and inference that he had knowledge or information of the unlawful and corrupt agreement between Warner, Priesmeyer and Ascher, and that this money was received as a bribe? We are of the opinion that it does not. To say that he had knowledge or information of this corrupt agreement and the receipt by Warner and Priesmeyer of the $500 as a bribe, would be a mere conjecture and guess, for the record upon this fatal question of knowledge or information on the part of the defendant Naughton is as silent as the grave. It does not furnish a satisfactory solution of this proposition, nor is it sufficient to supply the defects of the State's testimony upon this question to say that the defendant should have explained his possession of the $500 in money. Under the rule as applicable to the administration of the criminal laws of this State it is incumbent upon the State to establish by substantial evidence every essential element of the crime with which the party is charged, and under the provisions of the statute prosecuting officers are not

even permitted to refer to the fact that the defendant failed to testify, and no inference of his guilt should be or can be drawn from such failure.

It may be that the defendant in this case is guilty of the offense charged in the indictment, but if we are longer to be guided by the well-settled rules as applicable to the administration of the criminal laws of this State, he cannot be convicted except upon substantial evidence establishing every vital and essential element of the offense with which he is charged. It is easy enough to say, "Oh, well, he is guilty and all this is a mere technicality;" that furnishes no warrant or justification in appellate courts absolutely ignoring all precedent and well-settled rules of evidence. Technical rules of law and evidence as well have universally been recognized by the most learned text-writers and the ablest courts of the country as being absolutely essential to the proper administration of the law. Law itself, as is defined by Mr. Blackstone, is but a rule of action applicable to animate and inanimate things.

The only testimony upon the question as to where the defendant obtained this money was introduced by the State, which affirmatively shows that he did not receive it from either Warner or Priesmeyer. As to his knowledge or information as to any corrupt agreement between Warner, Priesmeyer and Ascher, and the receipt of this money as a bribe, as before stated, there is not the slightest evidence tending to prove such fact. Conceding for the purposes of this case that the indictment charges an offense, manifestly the State has wholly failed to establish some of the essential elements constituting such offense.

We have given expression to our views upon the legal proposition as disclosed by the record, which results in the conclusion that the judgment of the trial court should be reversed and the cause remanded

with directions to sustain the plea in abatement interposed by the defendant.

*Gantt, P. J.,* concurs in the opinion on the first proposition, and expresses no opinion as to the second; *Burgess, J.,* concurs in the opinion as rendered.