## MARCELLO v. UNITED STATES.

### No. 13773.

United States Court of Appeals
Fifth Circuit.

April 22, 1952.

438

Wm. C. Orchard, G. W. Gill, New Orleans, La., for appellant.

John N. McKay, U. S. Atty., New Orleans, La., for appellee.

Before HOLMES, RUSSELL, and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from a judgment finding the appellant guilty of contempt of the United States Senate in violation of Title 2, U.S.C.A. § 192, which reads:

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

Senate Resolution No. 202 of the 81st Congress, Second Session, was adopted by the United States Senate on May 3, 1950. The first section of the Resolution reads as follows:

"Resolved, That a special committee composed of five members, two of whom shall be members of the minority party, to be appointed by the President of the Senate from the Committee on Interstate and Foreign Commerce of the Senate and the Committee on the Judiciary of the Senate, is authorized and directed to make a full and complete study and investigation of whether organized crime utilizes the facilities of interstate commerce or otherwise operates in interstate commerce in furtherance of any transactions which are in violation of the law of the United States or of the State in which the transactions occur, and if so, the manner and extent to which, and the identity of the persons, firms or corporations by which such utilization is being made, what facilities are being used, and whether or not organized crime utilizes such interstate facilities or otherwise operates in interstate commerce for the development of corrupting influences in violation of law of the United States or of the laws of any State; Provided, however, That nothing contained herein shall (1) authorize the recommendation of any change in the laws of the several States relative to gambling, (2) effect any change in the laws of any State relative to gambling, or (3) effect any possible interference with the rights of the several States to prohibit, legalize, or in any way regulate gambling within their borders. For the purposes of this resolution, the term 'State' in-

cludes the District of Columbia or any Territory or possession of the United States."

A sub-committee of one Senator of this special committee convened in New Orleans, Louisiana, on January 25, 26, 1951, and proceeded to take testimony. When the appellant was subpoenaed to testify before the sub-committee, he was placed on the stand as a witness and administered the oath. He answered the first two questions which called for his name and address. He was then asked whether he had copies of his federal income tax returns since January 1, 1946, and certain other documents called for by the subpoena, and in response he read the following statement:

"With due respect to the committee, I am going to refuse to answer any and all questions other than my name and place of residence on the ground that the answer might tend to incriminate me and I refuse to produce any documents, records, or paper on the ground that they might tend to incriminate me."

The appellant was nevertheless asked some 166 specific questions, each of which he refused to answer on the ground that his answer might tend to incriminate him. The indictment was in 49 counts, each count charging that the appellant refused to answer a specific question propounded to him which was "pertinent to the question then under inquiry". Trial by jury was waived, and the court adjudged the appellant not guilty under 43 counts, and guilty under the six counts which charged the appellant with refusing to answer the following questions:

"Count 1: Now, sir, is there an indictment pending against you?

"Count 15: Have you ever been outside the State of Louisiana?

"Count 31: Do you know Salvatore Vittali?

"Count 34: Did you have an interest in the Beverly Club?

"Count 38: Did you ever make a statement that you had an interest of between $40,000 and $50,000 in the Beverly Club?

"Count 39: Did you ever make the statement that you had bought the New Southport Club from Vic Trapani at a cost of between $160,000 and $165,000?"

The court found that appellant was not justified in his claim of privilege against self-incrimination in refusing to answer the questions as charged in Counts Nos. 1, 15, and 31, and found that as to the questions in Counts Nos. 34, 38, and 39, the appellant had waived his right to assert his privilege against self-incrimination because of a previous statement made orally under oath to a Special Agent of the F. B. I. in 1948.

The appellant insists that the questions contained in the counts of the indictment upon which he was convicted were not "pertinent to the question under inquiry" as required by Title 2, Section 192, United States Code. See Sinclair v. United States, 279 U.S. 263, 296, 49 S.Ct. 268, 73 L.Ed. 692; McGrain v. Daugherty, 273 U.S. 135, 173, 47 S.Ct. 319, 71 L.Ed. 580; Ex parte Frankfeld, D.C., 32 F.Supp. 915.

The position of the United States is well stated in brief of its counsel as follows:

"The committee generally was engaged in the investigation of crime throughout the country, whether, it be local crime or federal crime. In the case of local crime it was the function of the committee to see whether facilities of interstate commerce were aiding the local violations with the idea ultimately of ascertaining whether or not it was advisable for the federal government to pass any statute, whether it be criminal or non-criminal, which would in some way enable the state governments and local communities to better cope with their local situation.

"The scope of the committee and the pertinency of matters into which it could, and can, inquire are almost limitless. Insofar as anything bearing upon crime, local or otherwise, is concerned the scope and pertinency of the Senate Resolution is very, very broad.

Accordingly, the persons whom the committee could call and the questions which they could ask those persons were and are almost without limit."

■ A Congressional inquiry may be as broad as the legislative purpose requires. Its power of inquiry as an aid to the legislative process should not be curtailed by the courts. Whether the questions for refusal to answer which the appellant was convicted were pertinent to the investigation presents a question of law which we decide in the affirmative. See In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154; McGrain v. Daugherty, 273 U.S. 135, 174, 47 S.Ct. 219, 71 L.Ed. 580; Trumbo v. United States, 85 U.S.App.D.C. 167, 176 F.2d 49; Marshall v. United States, 85 U.S.App.D.C. 184, 176 F.2d 473; United States v. Emspak, D.C., 95 F.Supp. 1012.

At the same time, we call attention that a most important part of the background or setting against which the court must determine whether the answers could possibly have a tendency to incriminate the appellant consists of the fact that each of the six questions must be regarded as pertinent to an "investigation of whether organized crime utilizes the facilities of interstate commerce in furtherance of any transactions which are in violation of the law of the United States or of the state in which the transactions occur."

A further part of that background or setting consists of the statement of the Chairman and only member of the subcommittee made in the course of the hearing:

"The committee will state further, to you, Counsel, that the committee has had quite an extensive investigation in which Mr. Marcello has played a very important part, in the State of Louisiana. The committee has information and reason to believe that he has had gambling, narcotics, and other kinds of operations with not only criminal characters in the State of Louisiana but in other parts of the United States; that he owns and has interest in quite a number of illegitimate businesses, illegal businesses, and probably some legal businesses; that he was born in Tunis, Africa, I believe in 1910, of Sicilian parents; that he came here in October 1910, that he has been engaged in many violations of law with various and sundry people from many parts of the United States; that he has had many meetings with criminal characters from other parts of the United States; investments in the Beverly Club, another club out here, I think, the Forrest Club, a racing news service, and many of the other organizations that counsel has asked about; that Mr. Marcello, according to the investigative reports, is one of the principal criminals in the United States today."

Other parts of that background or setting are supplied by newspaper articles, including the New Orleans Item of October 12, 1950, proclaiming in front page headlines, "Gretna Hoodlum Called Crime Czar". The headline was accompanied by "rogue's gallery" pictures of the appellant. The article is by the nationally syndicated columnist Drew Pearson, and states, "Senator Kefauver of Tennessee is the only man so far who has had the courage to beard this gang of criminals."

The article further charges that the Mafia dominates the nation's criminal rackets and names Carlos Marcello (appellant), the Louisiana head of the "Mafia", the infamous "Black Hand". It charges Marcello was made Mafia head man by Frank Costello in a meeting at the Black Diamond Club in 1947. Marcello is pictured as the "Number 1 gangster and racketeer in Louisiana". "Through strong-arm tactics he has established a virtual monopoly on criminal activity in that area". It links Carlos Marcello as a partner in crime of Frank Costello, Phil Kastel, Sylvestro Carollo, "his hatchet man", and Anthony Carollo. Along with these persons, the article connects appellant with alleged gangsters and racketeers from all of the United States, as members and in control of the Mafia organization.

Also set forth in detail is the criminal record of Marcello, his business activities, his citizenship status, and his conviction on a marijuana charge in 1929. It also contains the story of Sylvestro Carollo's de-

portation, Mexican stay and illegal reentry into the United States, with the implication that appellant was implicated therewith.

Further, before Marcello testified at the meeting on January 25, 1951, Mayor Morrison made a statement to the sub-committee, in part as follows:

"There is an impressive array of evidence before your Committee, some of it supplied by the New Orleans Police Department, concerning the tie-ins and tie-ups of the national operators with some of the local gambling element in Jefferson Parish. I am particularly referring to the Kastel-Marcello axis which encompasses various enterprises, including the Beverly Club, the racing-wire service in Gretna, the coin-machine distribution business, and other business operations.

"I will not go into detail on these because your staff, on its own initiative and through the reports of Police Sergeant Earl Weiser, had a voluminous file on this subject. Suffice it to say that Marcello and his associates have not been and are not welcome in the city of New Orleans."

The record contains still further background evidence, a careful consideration of all of which convinces this court that, while the appellant was compelled to take the stand as an ordinary witness, his actual status was markedly similar to that of an accused in a criminal trial.

Before announcing its decision upon the appellant's guilt, the district court very properly stated:

"So in considering whether or not this defendant considered each question to determine whether or not the answer to that question might incriminate him, this Court must consider his announced refusal at the beginning of the inquiry to answer any questions."

The privilege against self-incrimination cannot be asserted in advance of the questions actually propounded in the examination or hearing. Mulloney v. United States, 1 Cir., 79 F.2d 566, 580; In re Weiner, 183 Misc. 267, 49 N.Y.S.2d 199; Commonwealth v. Tracey, 137 Pa.Super. 221, 8 A.2d 622; In re Schnitzer, 295 Mich. 736, 295 N.W. 478; In re Jennings, 154 Or. 482, 59 P.2d 702, 717; Wilman v. Miller, 178 Misc. 549, 35 N.Y.S.2d 352; Schiffman v. Bleakley, Sup., 46 N.Y.S.2d 353; Shushan v. United States, 5 Cir., 117 F.2d 110, 117, 133 A.L.R. 1040.

In this case, we are nevertheless convinced that appellant's position at the hearing being virtually that of an accused upon trial relieves his blanket refusal of the capricious and contemptuous implications which it would otherwise bear.

"For the *party-defendant in a criminal case,* the privilege permits him to refuse *answering any question whatever* in the cause, on the general principle that it 'tends to criminate' ". Wigmore on Evidence, 3rd Ed., Vol. 8, Sec. 2268, p. 392. See also Title 18, U.S.C. § 3481; Raffel v. United States, 271 U.S. 494, 496, 46 S.Ct. 566, 70 L.Ed. 1054; Reagan v. United States, 157 U.S. 301, 304, 15 S.Ct. 610, 39 L.Ed. 709; Wolfson v. United States, 5 Cir., 101 F. 430, 436; Brown v. United States, 9 Cir., 56 F.2d 997.

The committee ignored the general claim of privilege, and propounded to the appellant some 166 specific questions. We come then to an examination of each of the six questions upon refusal to answer which the appellant stands convicted, applying to each the test which we understand to be prescribed by the Supreme Court in Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118; viz.: In the setting in which it is asked and from a careful consideration of all the circumstances in the case, is it perfectly clear to the court that the witness is mistaken, and that the answer cannot possibly have a tendency to incriminate him? See also: Feldman v. United States, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408; Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110; Arndstein v. McCarthy, 254 U.S. 71–72–73, 41 S.Ct. 26, 65 L.Ed. 138; Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344; Temple v. Commonwealth, 75 Va. 892, 899; Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170; Ex parte Irvine, C.C., 74 F. 954, 960; Estes v. Potter, 5 Cir.,

183 F.2d 865; United States v. Burr (In re Willie), 25 Fed.Cas.No.14,692e, pages 38, 40; United States v. Raley, D.C., 96 F.Supp. 495–497; United States v. Jaffee, D.C., 98 F.Supp. 191, 194.

"Count 1: Now sir, is there an indictment pending against you?"

■ The evidence shows that appellant had previously claimed privilege as to the production of books, papers and income tax returns. Then followed a series of eleven questions of which this question was the fifth, attempting to ascertain why appellant was claiming the privilege against self-incrimination. These questions were of the nature as to whether the appellant had a particular offense in mind, if it involved himself or others, when it occurred, his arrests, and criminal record. Further in this series he was asked if there were any special circumstances for his refusal to answer. We think that in the series, setting, and circumstances in which this question was asked, appellant was justified in the assertion of the privilege against self-incrimination.

"Count 15: Have you ever been outside the State of Louisiana?"

■ Gambling and narcotic operations "with criminals in other parts of the United States", and meeting with "criminal characters from other parts of the United States" could well require the absence of appellant from the State of Louisiana. A direct answer could well form a link in a chain of evidence or reveal sources from which evidence could be obtained that would lead to the prosecution or conviction of the witness. With this background, a direct answer to this question might reasonably result in an injurious disclosure by the appellant.

"Count 31: Do you know Salvatore Vittali?"

■ The test to be applied to "Do you know ........?" questions has been several times stated. Estes v. Potter, 5 Cir., 183 F.2d 865, 867; Alexander v. United States, 9 Cir., 181 F.2d 480; Kasinowitz v. United States, 9 Cir., 181 F.2d 632; United States v. Raley, D.C., 96 F.Supp. 495; United States v. Jaffee, D.C., 98 F.Supp. 191–195;

United States v. Emspak, D.C., 95 F.Supp. 1012.

Appellant was asked on his examination before the committee if he knew fourteen different persons. Two were evidently considered so incriminatory that they were not included in the indictment. Twelve were included in the indictment and he was acquitted on all except as to Vittali.

The trial judge found appellant guilty on this count because he considered appellant's justification of his refusal:

"was because of Vittali's connection with a murder, which of course is a state offense and has no Federal implication whatever."

■ An early opinion of the United States Supreme Court authored by Chief Justice Marshall held that a federal court may not compel a witness to testify against himself in any criminal case, even though the offense be one against the state rather than against the federal government. United States v. Saline Bank, 1 Pet. 100, 7 L.Ed. 69; see also opinion of Mr. Justice Holmes in Ballmann v. Fagin, 200 U.S. 186, 195, 26 S.Ct. 212, 50 L.Ed. 433. There can be no doubt however that the learned district judge had in mind the later rulings of the Supreme Court, which are binding alike upon him and upon this court, such as United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210, and Feldman v. United States, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408; see also 58 Am.Jur., Witnesses, sec. 51; Annotation 82 A.L.R. 1376; 8 Wigmore on Evidence (2nd Ed.) Sec. 2258. The doctrine is so strongly entrenched that it appears as futile to protest as it is to expect an individual to feel that his constitutional privilege has been safeguarded because the penitentiary into which his answer may land him is under the supervision of the state instead of the federal government.

The principle upon which the privilege against self-incrimination is based has been well expressed by Mr. Justice Bradley in Boyd v. United States, 116 U.S. 616, 631, 632, 6 S.Ct. 524, 533, 29 L.Ed. 746:

"And any compulsory discovery by extorting the party's oath, or com-

pelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom."

The Supreme Court but not this court may well pause when it considers how far that principle is abandoned when a Congressional Committee is given unlimited power to investigate State crimes to identify the criminals. A witness might be confronted with the necessity of choosing one of three courses: (1) Refusing to answer and thereby risking a conviction for contempt; (2) committing perjury; or (3) confessing his guilt to a crime against the State. The appellant chose to stand upon his constitutional privilege in the face of the thinly veiled threat from the Chairman:

"It is in the discretion of the judge who hears the case, in the event there is a conviction, to say whether they run consecutively or concurrently. So if they should find Mr. Marcello guilty and find him guilty of 50 contempts, it would be in the discretion of the judge whether it would be 1 year or whether it would be 50 years."

It must be remembered also that, in our federal system, the administration of criminal justice rests preponderantly with the states. Jerome v. United States, 318 U.S. 101, 105, 63 S.Ct. 483, 87 L.Ed. 640.

A method by which the privilege may be completely circumvented suggests itself when we consider that State tribunals may pursue a like course with reference to criminal offenses against the federal government. See Feldman v. United States, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408. With much inconsistency, we may indulge the hope that more state courts will follow the lead of the Supreme Court of Michigan in the view that,

"It seems like a travesty on verity to say that one is not subjected to self-incrimination when compelled to give testimony in a State judicial proceeding which testimony may forthwith be used against him in a Federal criminal prosecution." People v. DenUyl, 318 Mich. 645, 29 N.W.2d 284, 287, 2 A.L.R.2d 625, 628.

The considerations to which we have just adverted are fruitless for a lower federal court, and we revert to the case before us. Was the district judge on sound ground in finding the appellant guilty under this Count 31 because Vitalli's connection was with the state offense of murder? The appellant's constitutional privilege related to the criminal connection *not* of Vitalli but of *himself*. While Vitalli might have been indicted merely for murder, the appellant might be confronted with a charge of causing Vitalli to travel in interstate or foreign commerce with intent to avoid prosecution, or custody, or confinement after conviction, or of pursuing a like course with reference to himself, or to some other witness in the murder case. Title 18, United States Code, §§ 2 and 1073. In view of the appellant's widespread criminal connections, it may not be safe to assume that Vitalli had not been guilty of or connected with other offenses for which he was not indicted. If, however, it be said that the Committee was interested only in the charge of murder against Vitalli, then for that charge to be pertinent to the question under inquiry before the Committee it must have had some connection with interstate commerce, and the district court was not justified in concluding that it "has no federal implication whatever." There were more implications to the question than the commission of a state offense. The appellant may possibly have known better than this Court that the answer would have a tendency to incriminate him for a federal offense.

"Count: 34: Do you have an interest in the Beverly Club?"

"Count 37: Did you ever make a statement that you had an interest between $40,000 and $50,000 in the Beverly Club?"

"Count 38: Did you ever make a statement that you had bought the New Southport Club from Vic Trapani at

444

a cost of between $160,000 or $165,-000?"

The record shows that appellant had previously refused to answer the basic questions concerning these two businesses by the assertion of his privilege of self-incrimination. Both of these basic questions were included in Count 6 of the indictment, on which count appellant was found not guilty by the district court.

Obviously, if appellant did not waive his privilege against self-incrimination, his conviction on these counts must be reversed. The possibilities in the case of Camarota v. United States, 3 Cir., 111 F.2d 243, were very different from and more definitely restricted than those with which the appellant was confronted. On the basic questions the district court properly followed an expression in the Hoffman case, supra [341 U.S. 479, 71 S.Ct. 819].

"The court should have considered in connection with the business questions, that the chief occupation of some persons involves evasion of federal criminal laws, and that truthful answers by petitioner to these questions might have disclosed that he was engaged in such proscribed activity."

It was the theory of the district court that as to these questions appellant had waived his privilege by his statement concerning the same subject matter several years prior to the committee hearing.

The appellant insists upon the principle of law as expressed in 58 Amer.Juris., Witnesses, Sec. 99, p. 82:

"Waiver as Affecting Subsequent Proceeding.—A person who has waived his privilege of silence in one trial or proceeding is not estopped to assert it as to the same matter in a subsequent trial or proceeding. The privilege attaches to the witness in each particular case in which he may be called on to testify, and whether or not he may claim it is to be determined without reference to what he said when testifying as a witness on some other trial, or on a former trial of the same case, and without reference to his declarations at some other time or place."

A number of state cases are cited in support of that text. See also Apodaca v. Viramontes, Sheriff, 53 N.M. 514, 212 P.2d 425, 13 A.L.R.2d 1427.

The appellee in attacking the principle of law last quoted makes an ingenious argument which may be sufficiently understood from a few short quotations from its brief:

"At the outset it is well to bear in mind that the privilege, although theoretically *one* privilege and applicable to *all* persons in the same manner, has been interpreted by the courts in such a manner as to leave little, if any, doubt that *there are actually two separate and distinct privileges granted by the Fifth Amendment.* One is the privilege afforded to a party *defendant* in a criminal case, and the other is the *privilege afforded to an ordinary witness.*

\*      \*      \*      \*      \*      \*

"To support their contention the state courts have uniformly relied upon the following statement made by Dean Wigmore:

" 'The waiver involved in the *accused taking the stand* is limited to the particular proceeding in which he thus volunteers testimony.' Wigmore on Evidence, 3rd Ed. Vol 8, Sec. 2276 P. 3158. (Emphasis supplied.)

"It is submitted that an examination into all of the State Court cases decided in favor of the 'single proceeding' theory will disclose a reliance either upon the above quoted passage or on other cases which in turn relied on this passage.

\*      \*      \*      \*      \*      \*

"This precise question has never been *decided* in the Federal Courts. However, the Ninth Circuit Court of Appeals has, by way of *dicta,* in a case involving an issue *identical* to the issue of waiver in the instant case, said that where a person makes a voluntary disclosure after having been warned of his constitutional privilege against self-incrimination that that person is deemed to have waived his privilege

against self-incrimination and cannot, in a subsequent proceeding, refuse to answer questions pertaining thereto on the ground that to so answer would tend to incriminate him. Schoeps v. Carmichael, 9 Cir., 1949, 177 F.2d 391."

■ The answer to the appellee's argument, we think, may be found in a principle already referred to in this opinion, but which appellee has apparently overlooked, namely that in determining whether the answer to a question can possibly have a tendency to incriminate, the court must take into consideration the setting in which it is asked and all of the circumstances in the case. Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118. When the appellant answered these questions before a Special Agent of the F. B. I. in 1948, the setting and circumstances may have been such that his answers could have been compelled. Several years later under the setting and circumstances of this investigation, his answers clearly might tend to incriminate him. Obviously, we think, he has not waived his privilege.

Of course, no question of tendency to incriminate can arise when there is "admission of guilt" or "clear proof of crime." See Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138; McCarthy v. Arndstein, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023. Even if the case relied on by appellee, Schoeps v. Carmichael, 9 Cir., 177 F.2d 391, had been a criminal proceeding, which it was not, the previous statements of Schoeps had been outright admissions of guilt, clear proof of his crime, and that case would have no application here.

Nor do we agree with the appellee that the Fifth Amendment grants two separate and distinct privileges against self-incrimination. The language of the amendment is too simple and direct to support any such duplicitous construction: "No person * * * shall be compelled in any criminal case to be a witness against himself". The reason that a difference in degree is so extreme as to appear to be a distinction in kind is disclosed, we think, by a brief passage from Wigmore on Evidence, 3rd Ed., Vol. 8, Sec. 2268, which we quote for the second time:

"For the party defendant in a criminal case, the privilege permits him to refuse answering any question whatever in the cause, *on the general principle that it 'tends to criminate'.*" (Emphasis supplied.)

In a criminal case the setting and circumstances are such that anything the defendant says may tend to incriminate him. Otherwise, the matter must be judged by the setting and circumstances of the particular case or proceeding. We are clear that there was no waiver by the appellant of the privilege against self-incrimination in this case.

The judgment appealed from is reversed, and a judgment of acquittal here rendered.

Reversed and rendered.