**KIEWEL v. UNITED STATES.**

No. 14788.

United States Court of Appeals
Eighth Circuit.

· May 6, 1953.

Rehearing Denied June 2, 1953.

Linus J. Hammond, St. Paul, Minn. (Gerald Mullin, Minneapolis, Minn., Cummins, Cummins, Hammond & Ames, St. Paul, Minn., and Nichols, Mullin, Farnand & Lee, Minneapolis, Minn., on the brief), for appellant.

Philip Neville, U. S. Atty., St. Paul, Minn., for appellee.

Before SANBORN, RIDDICK and COLLET, Circuit Judges.

COLLET, Circuit Judge.

Charles E. Kiewel was held to be in contempt of court for failing to answer questions propounded to him by a grand jury which he deemed might tend to incriminate him. The facts are not in dispute.

As early as 1948 an Internal Revenue agent sought to interview Mr. Kiewel concerning income tax matters. Kiewel was president of the Minneapolis Brewing Company. It does not definitely appear from the record, but the broad implication is inherent in the record that the primary object of the attempted inquiry then and now was and is to determine for what purpose and to whom certain expenditures were made out of a fund or ledger account of the brewing company, shrouded in mystery and known as Account No. 9088. When an effort was made by the agent to interview Mr. Kiewel, he employed counsel. After several efforts to interview Kiewel through his counsel were made without success, there was a suggestion made in May, 1948, that a summons be issued by the Bureau of Internal Revenue, directed to Mr. Kiewel, the object of which would be to secure his appearance before a representative of the Bureau for questioning. The summons was not actually issued. In August, 1948, the agent assigned to the investigation went to Washington to confer with the Chief of the Intelligence Division of the Bureau concerning the investigation. The summons was never issued. In July, 1949, Mr. Kiewel suffered a heart attack, and in December of that year the agent was notified by letter from Kiewel's doctor of that fact. The record shows no further effort to pursue the matter until a United States grand jury issued a subpoena for Mr. Kiewel in April, 1952. The United States Marshal was unable to serve the subpoena and a return of not found was made. Negotiations then took place between the foreman of the grand jury, the United States District Attorney, and counsel for Kiewel, in which the former undertook to reach an agreement that, in view of Kiewel's health, he appear informally at some convenient place for questioning, thereby avoiding the strenuous nature of an appearance before the grand jury. No arrangement was consummated. Another subpoena was issued August 21, 1952, and served on Kiewel, directing him to appear before the grand jury on September 9, 1952, and bring with him the books and records of the brewing company relating to disbursements from a "certain account, fund or sum of money" kept by the brewing company from the year 1940 to the date of the subpoena, "out of which fund disbursements were made to certain aldermen of the City of Minneapolis, political parties, candidates for election to political office, public employees, or others, to the end that there [might] be disclosed and made known to the Grand Jury the full history of said account and all amounts deposited therein and disbursed therefrom and to whom disbursements were made." Thereafter, at the suggestion of his attorney, Mr. Kiewel had a medical examination. The result of the examination, as certified by the doctor, was that Kiewel's appearance before the grand jury would be "extremely dangerous to his health and life." His attorney appeared before the grand jury on September 9, 1952, on Mr. Kiewel's behalf, advised the jury of the doctor's opinion and asked that for that reason he be excused from attendance. The grand jury directed that he be cited for contempt

for not appearing. That was done, and after hearing by the United States District Court he was adjudged in contempt.

The Court's order permitted Kiewel to purge himself of contempt by appearing before the grand jury on September 19, 1952. He appeared before that body on that day and presented to the jury a statement theretofore prepared by his counsel claiming his constitutional right to decline to answer any questions which might be asked him on the ground that he was being investigated as a prospective defendant and not as a witness and that any answers he might make might tend to incriminate him. He was asked a number of questions concerning the books and records of the brewery, which had been furnished the jury theretofore, and particularly concerning Ledger Account No. 9088. All of the questions related to periods of time prior to June 30, 1949, the latter date being the date of the last entry appearing in Account No. 9088. The general nature of the inquiry was to whom disbursements from that account were made and for what purpose. All of these questions Kiewel refused to answer. He was excused, the grand jury made its final report and was discharged September 25, 1952.[1]

On December 9, 1952, Kiewel was again cited by the United States District Court to show cause why he should not be adjudged in contempt of court for failing to answer the questions propounded to him by the grand jury on September 19, 1952. The return to the order to show cause set up the defense that he was entitled to stand upon his constitutional rights claimed before the grand jury and that the jury had been finally discharged September 25, 1952. After a hearing, the court again found him to be in contempt of court and in an order entered February 2, 1953, ordered and directed him to appear before a grand jury to be subsequently called and to purge himself of contempt by answering the questions put to him by the United States Attorney for the grand jury on September 19, 1952, as set out in a transcript of the proceedings on that day, and other similar questions which might be put to him *relating to transactions and events occurring more than three years prior to the time of appearance before the grand jury*. The order further provided that if he did not do so he would be fined $1,000.00. It further provided that the court retained jurisdiction "for the purpose of taking further action or meting out further punishment" in the event he failed to purge himself of the contempt. This appeal is from that order. The trial court directed that the United States Attorney represent that court in these proceedings. He has done so. We shall refer to the parties as the Government and the Respondent.

The questions presented for determination are:

1. Did the Respondent have the right to refuse to answer questions designed and intended to disclose the purposes for which the expenditures shown in Account No. 9088 were made by the brewing company, a corporation, and to whom those payments were made?

2. Did the court find Respondent guilty of contempt because of the nature of the answers he made to the questions he did answer, and, if so, was that error?

3. Did the fact that the grand jury had been discharged prior to the date of the hearing on the Order to Show Cause of December 9, 1952, and the judgment of conviction entered February 2, 1953, prevent the court from ordering Respondent to ap-

---

1. Counsel for the Government states in his brief that it should not be assumed that the grand jury was discharged September 25, 1952, because there was no evidence to that effect. But the return to the order to show cause of December 9, 1952, states under oath that fact, which does not appear to have been controverted at the hearing on that order. The report of the grand jury dated September 19, 1952, is reproduced in full in the record. It is in the form of a final report. Those facts would probably be sufficient upon which to safely base an assumption that the grand jury was discharged on September 25, 1952. But since the original record is subject to reference by us under our rules, we have referred to that record and find that it does affirmatively show that the grand jury was discharged on September 25, 1952.

pear before a subsequent grand jury under penalty for his refusal to do so?

4. Did the court have the power to retain jurisdiction for the purpose of imposing further penalties in the event Respondent did not appear before a subsequent grand jury and give the information ordered given?

■ For present purposes Respondent places himself in the category of an accused person being required to testify before a grand jury investigating his conduct preparatory to filing criminal charges against him. Because, if he is in that category, it has been said that he may not be required to testify at all. Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L. Ed. 1054; Marcello v. United States, 5 Cir., 196 F.2d 437.

But if he was in the position of a witness he may not claim the privilege of the Fifth Amendment [2] to protect others, Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; United States v. Singleton, 3 Cir., 193 F.2d 464, or to save himself mere embarrassment, Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819, but is entitled to refuse to testify only when the witness has reasonable cause to apprehend danger from a direct answer. Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118; Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344; Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198; Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819.

■ Was Respondent a witness or an accused before the grand jury? That body was making an investigation to determine to whom and for what purpose money had been paid by the brewing corporation. That inquiry was pertinent to the legitimate investigation of possible violations of the Internal Revenue laws. The corporation had not deducted those payments from its gross revenue for tax purposes. The inquiry was not, therefore, for the purpose of subjecting the corpo-

ration to the payment of further taxes or to show dereliction on its part in that regard. And the corporation was not entitled to the privilege of the Fifth Amendment anyway. United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542; Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652. The inference is strong that there was a suspicion of bribery or other improper use of the funds, violations of the laws of Minnesota. But, again, the privilege could not be claimed before a federal grand jury as a shield to avoid disclosure of violations of state laws. United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210; Marcello v. United States, 5 Cir., 196 F.2d 437. In this case the danger must exist of a disclosure of a violation of a federal law for the privilege to exist. While the witness must have reasonable cause to apprehend danger of incrimination, Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198; Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 818, 95 L.Ed. 1118, which question is for the court to determine and not the witness, Hoffman v. United States, supra, Rogers v. United States, supra, yet when the inquiry is found to be pregnant with danger, great latitude must be afforded the witness in determining what questions it may be dangerous for him to answer. Mason v. United States, supra. And in order to demonstrate to the court reasonable cause for danger to the witness, he need not show that the answers would incriminate him, because if such showing was required, in making proof of it he would be required to disclose the very facts which the privilege permitted him to conceal. Hoffman v. United States, supra. He need only show such circumstances as will indicate to the court "that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Hoffman v. United States, supra.

Was there reasonable possibility from the nature of the inquiry made of Respond-

2. "No person * * * shall be compelled in any criminal case to be a witness against himself".

ent that he was in danger of incriminating himself in answering the questions propounded to him? As heretofore noted, those questions sought to elicit information concerning the purposes for which the funds of the corporation were expended and to whom. Respondent, without indicating what his answers might be, says in his brief that the nature of the inquiry made it appear that the grand jury was seeking information that would involve him in violations of the Internal Revenue laws. He does not, and is not required to point to the specific criminal statute of which he would have furnished evidence of violation, if he told to whom and for what purposes the funds were disbursed. It is incumbent upon us, therefore, to examine the circumstances under which the questions were propounded, and their implications, and if therefrom we conclude that there is reasonable ground to believe that the investigation of the subject matter of the inquiry might lead to the incrimination of Respondent, should he make the answers requested, we must enforce the privilege, unless, as stated in the Hoffman case, it is perfectly clear that Respondent is wrong in believing that answering the particular questions could possibly have a tendency to incriminate him.

The three-year general Statute of Limitations had run before he was called as a witness,[3] but prosecutions for offenses involving income tax evasions are by 26 U.S.C. § 3748, extended to six years. The trial court concluded there was no possibility of danger of Respondent's prosecution for income tax evasion from testimony by him as an officer of the corporation, as to where the funds went or for what purpose, since he was not likely to be prosecuted for the failure of others to report their income. There was no other section of the Internal Revenue law called to that court's attention.

We are forced to the conclusion that "the implications of the question, in the setting in which it is asked, * * * or an ex-

planation of why it cannot be answered might be dangerous because injurious disclosure could result." Hoffman v. United States, 341 U.S. 479, 486–487, 71 S.Ct. 814, 818, 95 L.Ed. 1118.

At the time of Respondent's appearance before the grand jury, the jury had the corporation's records of Account No. 9088. Respondent was president of the corporation from 1940 until after June 30, 1949, the date of the last entry in that account. There is a strong inference from the following questions propounded to Respondent that some of the payments made from that account were made to Respondent himself, and that he, as president, requisitioned other amounts from the fund for unidentified purposes:

"Q. Now, Mr. Kiewel, I will ask you whether or not it was your practice as President of the Minneapolis Brewing Company from time to time to requisition funds of the Brewing Company for an unidentified use, and receive from the Brewing Company cash, which amounts were charged to an account known as 'Sundries,' in the bookkeeping system? A. I refuse to answer.

\* \* \* \* \* \*

"Q. I shall show you a group of ledger sheets or account sheets, each of which is called distribution ledger account No. 9088, each of which says on it, 'Special Sundry,' the first one of which starts with the date January 2, 1940, the last one of which, chronologically, ends June 30, 1949. There are in all twelve such sheets. To each sheet is attached by clip numerous yellow slips called, 'Petty Cash Vouchers.' I shall ask you whether you recognize those as being part of the official books and records of the Minneapolis Brewing Company? A. I refuse to answer for the same reason.

"Q. Some of these yellow slips bear the initials—and by yellow slips I have

---

3. "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or

the information is instituted within three years next after such offense shall have been committed." 18 U.S.C. § 3282.

reference to the Petty Cash—bear the initials C. E. K. I will ask you if C. E. K. represent your initials? A. I refuse to answer on the same basis.

"Q. I will ask you whether the initials are in your handwriting? A. I refuse to answer that on the same basis.

"Q. I will ask you, not as an individual but as an officer of the corporation, namely Minneapolis Brewing Company, whether you can identify these sheets to which I have referred and the attached ledger sheets. A. I refuse to answer that.

"Q. I will ask you whether it isn't a fact that from the years 1940, starting January 2, until June 30, 1949, you didn't periodically make withdrawals of cash from the corporate funds and charge the same to account No. 9088 as hereinabove described? A. I refuse to answer on the same basis.

"Q. I will ask you whether you didn't in the year 1941 draw $3,125, as hereinabove described, and charge to that account? A. I refuse to answer.

"Q. In the year 1942, $100? A. I refuse.

"Q. In the year 1943, $14,107? A. I refuse to answer. I don't know in the first place, what it was for.

"Q. In the year 1944, $225, personally, though the total amount is $17,148.-65? A. I refuse to answer.

"Q. Same answer. In the year 1945, the sum of $22,284.17? A. I refuse to answer.

"Q. Year 1946, $1,200 yourself and a total charge to this account of $21,-491.34? A. Same answer.

"Q. In the year 1947, a total of $2,-946.54? A. Same answer.

"Q. In the year 1948, total of $1,-850? A. Same answer.

"Q. And the year 1949, up through June 30, a total of $2,700? A. Same answer.

"Q. Now, is it your statement, Mr. Kiewel, that you will decline to answer any question that might be put to you concerning this account from the date January 2, 1940 through June 30, 1949? A. I refuse on the same basis."

The grand jury's investigation embraced, among other things, evasions of income taxes. If any of these funds, which we must, in view of the foregoing circumstances, for present purposes infer were withdrawn by Respondent, actually represented unreported income to him because he retained them for his own use, then there is more than a reasonable probability that his truthful answers to those questions would subject him to prosecution for violation of the Internal Revenue laws.

█ We may not ignore the possibility or probability that the disbursements from the fund, or some of them, were retained by Respondent. The Supreme Court directs that we be governed as much by personal perception of the peculiarities of the case as by the facts actually in evidence. Ex parte Irvine, C.C., 74 F. 954; Hoffman v. United States, supra. If, as stated heretofore, Respondent was required to explain the reason why his testimony might be incriminating, that requirement would destroy the privilege given by the Constitution. Since he is not required to do so, we are forced to assume as existent the possibilities reasonably inherent in the situation presented. Doing so we cannot escape the reasonable possibility that there was an evasion of income taxes by Respondent, and reasonable ground for him to apprehend danger to himself from being compelled to answer the questions.

As the authorities heretofore referred to demonstrate, once the fact appears that the witness has reasonable ground to apprehend danger from answering, great latitude must be allowed him in judging for himself the effect of any particular question.

Speaking in plain language, if Respondent is telling the truth when he says under oath that his testimony concerning these payments would incriminate him and that,

as he states it in his claim of the privilege not to testify, "* * * it appears conclusively that I am the party who is being investigated and a prospective defendant in said investigation, and that I am not called as a witness, and that any answers I may make to any questions submitted to me may tend to incriminate me and convict me of a violation of the laws of the United States * * *" and "that any testimony I might give would tend to result in an indictment being returned against me by this grand jury"—we must, indulging the reasonable possibilities of the situation, assume that Respondent has evaded the payment of income taxes and that his answers to the questions quoted will disclose that fact. Again, using very plain language, if he did not tell the truth when he claimed the privilege on the ground stated, perjury is the result and the constitutional privilege is no protection from prosecution therefor. Claiborne v. United States, 8 Cir., 77 F.2d 682.

Respondent refers to several other statutes as having a possible application. As he states it in his brief: "The Court's particular attention is called to Section 205 of the Federal Alcohol Administration Act, Title 27 U.S.Code relating to Unfair Competition and unlawful practices of persons engaged in the business of distillers or brewers, and the penalties provided for a violation thereof as set forth in Section 207 of that Title. * * * to Title 18 Section 610 United States Code forbidding contributions by corporations to campaigns to elect persons to Federal offices, * * * contributions by officers and directors. * * * to Title 18 U.S.Code, Section 201 and Section 211 relating to offering gratuities to officers and employees of the United States and to revenue officers. * * * to the Food and Drug Act, Title 21, U.S. Code, Sections 331, 332, 333 and Section 342." These particular Acts of the federal laws are called to our attention, as Respondent states it, "as being statutes of the United States that the respondent could be concerned about." He says that there are others, and particularly tax statutes, "which are pertinent to this problem" without identifying them. These other statutes, referred to as "pertinent to this problem", may or may not be window dressing or camouflage to conceal or divert attention from the real danger. It is unnecessary to analyze the possibilities of the applicability of those statutes, since the Revenue Act furnishes justification for Respondent's refusal to answer.

There is no substance in the point that the trial court erred in holding Respondent in contempt for answering the questions he did answer. The memorandum opinion conclusively demonstrates that the judgment was not based on any such grounds.

Counsel for the Government suggests that Respondent has in effect been granted immunity because he was called as a witness and having been called if he testifies to any incriminating facts he could not be indicted therefor. Cases such as United States v. Edgerton, D.C., 80. F. 374 and State v. Naughton, 221 Mo. 398, 120 S.W. 53, are cited in support of that argument. Those, and similar cases wherein indictments were quashed because a witness was compelled to give evidence before a grand jury which resulted in his indictment, are not in point. There the court only remedied the wrong previously done when his constitutional rights were violated.

In view of the conclusions stated, the remaining questions become unimportant. The order is reversed and Respondent's present conviction is set aside.

SANBORN, Circuit Judge (concurring).

I have no doubt that as a practical matter the District Court's estimate of the situation of Charles E. Kiewel as a witness before the grand jury was correct and that he was never in any real danger of incriminating himself. The danger was that he would or might incriminate others who had accepted contributions out of a "slush fund" formerly maintained by the Minneapolis Brewing Company. His interest was in protecting them, and not himself, but, as Judge Collet has pointed out, it was not utterly inconceivable that Kiewel's evidence might have disclosed that he had been dipping into the fund himself or that some of the withdrawals made by him for others might have been taxable

**8**

to him as his income and have been unreported.

Realistically, I think that Kiewel was guilty of contempt in refusing to give the grand jury the information it was seeking. From a theoretical standpoint, it can be argued that he was in some slight danger of incriminating himself and therefore could not be adjudged guilty.

The opinion of Judge Hastie in United States v. Coffey, 3 Cir., 198 F.2d 438, shows how difficult it is, under the recent decisions of the Supreme Court, to sustain a judgment for contempt in a case such as the instant case. In the Coffey case, the Court of Appeals said, pages 440–441 of 198 F.2d:

"* * * It is enough (1) that the trial court be shown by argument how conceivably a prosecutor, building on the seemingly harmless answer, might proceed step by step to link the witness with some crime against the United States, and (2) that this suggested course and scheme of linkage not seem incredible in the circumstances of the particular case. * * *

"Finally, in determining whether the witness really apprehends danger in answering a question, the judge cannot permit himself to be skeptical; rather must he be acutely aware that in the deviousness of crime and its detection incrimination may be approached and achieved by obscure and unlikely lines of inquiry."

I concur in the reversal of the order appealed from.