**MAFFIE v. UNITED STATES.**

No. 4735.

United States Court of Appeals
First Circuit.

Jan. 7, 1954.

Michael Carchia, Boston, Mass. (Stephen C. Struffolino, Lawrence, Mass., with him on brief), for appellant.

Charles F. Choate, Asst. U. S. Atty., Boston, Mass. (Anthony Julian, U. S. Atty., and Edward D. Hassan, Asst. U. S. Atty., Boston, Mass., with him on brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Adolph Maffie appeals from a judgment imposing a sentence of imprisonment for one year upon conviction of the offense of criminal contempt. The case is one of several which we heard together, arising out of a federal grand jury investigation of the Brink's robbery in Boston on January 17, 1950.[1]

---

[1] The other opinions in this group of cases are in Carlson v. United States, No. 4732, 1 Cir., 209 F.2d 209; Hooley v. United States, 1 Cir., 209 F.2d 219; O'Keefe v. United States, 1 Cir., 209 F.2d 223; Daly v. United States, 1 Cir., 209 F.2d 232; and Hooley v. United States, 1 Cir., 209 F.2d 234.

Our main opinion in this group of cases, in Carlson v. United States, No. 4732, 1 Cir., 209 F.2d 209 should be read for a fuller understanding of the present case. But this case has certain difficult features of its own, and as we keep thinking about it, we fear this will develop into a main opinion too.

On December 16, 1952, Maffie appeared as a witness before the Brink's grand jury, pursuant to summons. After declining to sign a broad "Waiver of Immunity" tendered him by the Assistant United States Attorney, Maffie testified at some length. He answered certain questions regarded by him as innocuous; but for the most part the examination did not get anywhere because of his repeated claim of privilege against self-incrimination.

On the following day the grand jury filed in the court a "presentment" reciting that Adolph Maffie "did wilfully, deliberately, and contumaciously, by evasion and irresponsive answers, obstruct the process of this Court, and did obstruct justice in failing and refusing to answer proper questions in the Grand Jury proceedings".

The district court gave notice of a hearing on this presentment. Notwithstanding the view taken by the district court in some of the companion cases, the court in the present case never seems to have regarded the presentment as initiating a proceeding on a charge of a consummated criminal contempt, in which the court was called upon to decide whether the conduct of Maffie in the course of his examination before the grand jury constituted a criminal contempt of the authority of the court. Upon the contrary, the court ruled at the hearing that Maffie was entitled to claim the privilege of declining to answer certain of the questions which had been addressed to him, but for the rest that the privilege had been improperly invoked; and Maffie was ordered to go back to the grand jury and answer the questions as to which the privilege did not apply. Upon Maffie's announcement in open court, through his counsel, that he would not comply with the direction of the court, the court adjudged Maffie to be in criminal contempt of its authority on account of disobedience of this order, presumably under 18 U.S.C. § 401(3).

We have not too clear an idea just what the terms of this order were. It was expressed from time to time in varying phraseology, and sometimes piecemeal, in a long, running colloquy with counsel. But we make nothing of that point, since appellant has not urged that the order was too vague to apprise him adequately of what he was supposed to do. Without doubt it was clear enough, as to certain of the questions, that Maffie was ordered to go back and answer them. However, Maffie chose not to comply even with the parts of the order that were definite enough.

In thus electing to disobey the district court order and inviting the judgment of criminal contempt, Maffie took his chances on being able to convince an appellate court that the district court committed reversible error in ruling that the privilege against self-incrimination was not properly invoked under the circumstances. But if he does thus succeed in this court, or ultimately on review by the Supreme Court, then the district court judgment of conviction for criminal contempt will be vacated because of the appellate determination that Maffie did not disobey a "lawful" order of the district court within the meaning of 18 U.S.C. § 401(3). That is what happened in Hoffman v. United States, 1951, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118.

There is a preliminary motion before us, upon which we have reserved action. Maffie moved that this court receive in evidence and consider a number of Boston newspaper stories for the limited purpose of demonstrating that Maffie had reasonable cause to apprehend danger of self-incrimination from direct responses to the questions the district court ordered him to answer. In support of this motion appellant relies upon Hoffman v. United States, 1951, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118. These newspaper stories, which were

never offered to the district court, describe the FBI and grand jury investigations of the Brink's case and indicate that many individuals who were associates of "Specs" O'Keefe were suspected of complicity in the robbery. Specific references are made to Maffie in a Boston Daily Globe story dated December 18, 1952, wherein it is stated that Maffie was known to federal officials "as a big time racketeer and gang leader." He was described as an associate of "Specs" O'Keefe, "chief suspect in the Brink's robbery", and was understood "to possess knowledge concerning what became of the Brink's money".

In the Hoffman case the district court had held the defendant in criminal contempt for refusing to answer certain questions which the court had directed him to answer before a federal grand jury. On appeal, 185 F.2d 617, the court of appeals declined to consider certain proffered newspaper clippings and other exhibits linking the defendant with underworld activities, because such evidence had not been before the district court when it issued its order. Subsequently this additional evidence had been presented to the district court in support of what was in effect a motion to vacate the contempt order, which motion the district court denied. The court of appeals affirmed the judgment of conviction. On certiorari the Supreme Court reversed. In a clear dictum it said that the court of appeals should have considered this supplementary evidence. We have some technical difficulty with this dictum, since it does not appear that the defendant took an appeal from the subsequent order denying the motion to vacate; and the only question before the appellate court was the correctness of the original judgment of conviction, which was entered before the said supplementary evidence had ever been offered to the district court. However, until we are told explicitly by the Supreme Court to the contrary, we shall decline to believe that the Hoffman case was intended to introduce a procedural innovation requiring an appellate court,

upon review of a judgment below, to receive and consider additional evidence which had never been presented to the court rendering the judgment under review. We therefore dismiss Maffie's motion to supplement the present record. We have no occasion to consider whether, upon remand of the case to the district court, a motion for a new trial could be made under Rule 33, Federal Rules of Criminal Procedure, 18 U.S.C., upon the basis of the supplementary evidence.

Some general observations on the privilege against self-incrimination may serve to put in better focus the issues we have to decide in this case.

We can readily understand the feeling of utter frustration which the prosecuting officials must have experienced throughout this grand jury investigation. But they were attempting the impossible, in the face of the constitutional privilege.

Our forefathers, when they wrote this provision into the Fifth Amendment of the Constitution, had in mind a lot of history which has been largely forgotten to-day. See VIII Wigmore on Evidence (3d ed. 1940) § 2250 et seq.; Morgan, The Privilege Against Self-Incrimination, 34 Minn.L.Rev. 1 (1949). They made a judgment and expressed it in our fundamental law, that it were better for an occasional crime to go unpunished than that the prosecution should be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused. The privilege against self-incrimination serves as a protection to the innocent as well as to the guilty, and we have been admonished that it should be given a liberal application. Hoffman v. United States, 1951, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118. If it be thought that the privilege is outmoded in the conditions of this modern age, then the thing to do is to take it out of the Constitution, not to whittle it down by the subtle encroachments of judicial opinion.

Sometimes it is said that one who claims the privilege impales himself on the horns of a dilemma: Either he is obviously a criminal, or else he is a liar

and a perjurer in stating under oath that he declines to answer because a truthful answer would incriminate him. Occasionally, but probably infrequently, this may be so. It depends upon the nature of the question.

Suppose the question is: "Did you pick X's pocket and steal his wallet?". Only a "Yes" answer could be incriminating, and if the witness claims his privilege, the fair inference is that he must be a pickpocket and a thief. That natural inference might be drawn to his detriment in the ordinary affairs of life—for instance, a bank might conclude that such a person could hardly be a good risk for employment as a teller, if he has got himself in such a fix that he cannot answer a question like that. The only place such inference cannot be drawn is at a criminal trial; the prosecution cannot build up its case upon an incriminating inference from the accused's previous claim of privilege. Otherwise the privilege against self-incrimination would be nugatory, for claiming the privilege would be tantamount to an admission of guilt.

In other instances an affirmative answer to a question might not be an admission of criminal guilt, but only of one fact, among several, that must be established to make out a crime, or of a fact that could serve as a link in a chain of circumstantial evidence from which guilt might be inferred, or it might be no more than an admission of a fact, colorless in itself, that might furnish a lead to a bit of evidence useful to the prosecution. See Blau v. United States, 1950, 340 U.S. 159, 161, 71 S.Ct. 223, 95 L.Ed. 170. In any of these situations, the witness may in fact not be guilty of any crime. Yet he is not obliged to make a disclosure which might assist the prosecution and increase the burden of his defense. For example, suppose the question is: "Did you kill X?". An affirmative answer is not an admission of criminal guilt—the killing may have been a nonnegligent accident or in the exercise of self-defense. But such an answer would tend to incriminate the witness, for it would admit one fact the prosecution would otherwise have to establish in making out a case of murder or manslaughter. Or again, suppose a witness, suspected of a recent robbery, is asked a question calling for a disclosure whether he had recently secreted a large sum of money in cash. The witness may in fact have had nothing to do with the robbery; yet an affirmative answer to the question would tend to be incriminating. His explanation of the source of his unaccustomed affluence might not be believed, and his disclosure of the fact that he had recently acquired a large sum of money might well serve as an incriminating bit of evidence fitting logically into a circumstantial pattern of evidence indicative of guilt of a robbery he did not commit. (Of course it does not matter whether he was guilty or not; in either case it is his constitutional privilege not to disclose a fact which might be useful to the prosecution in building up a case against him.)

In the course of the examination, the witness may claim his privilege but once, or he may claim it over and over again, with monotonous repetition of the customary phrase. This in itself would not necessarily be indicative whether the privilege was being misused:

On the one hand there may be nothing to suggest that the witness is under suspicion. He may be called as a good citizen who might be able to throw light upon the crime under investigation. Yet the interrogator might, all unwittingly, hit upon a question the answer to which, as the witness realizes, might in the sense above explained tend to incriminate him, if not in connection with the crime under investigation, then in connection with some other federal crime. The witness may have occasion to exercise his privilege in only that one instance.

On the other hand, the witness may have reason to believe that he himself is under suspicion and that it will be the purpose of the interrogator to worm out of him all the self-incriminatory disclosures possible. In that case, the situation of the witness approaches that of an

accused person at a criminal trial, who may elect to keep silent altogether. The witness may be willing to answer certain formal preliminary inquiries, as to matters generally known, such as his name, residence, age, et cetera. But he may have a justified apprehension of danger in answering further. He may not have the acuteness to see what an innocuous-looking question, put by a resourceful cross-examiner, is leading up to. Yet he might not be unreasonable in believing that the question was asked for a purpose, and that the purpose was to lead him into a booby trap in which he would make some disclosures useful to the prosecution in weaving a case against him. Just where the line should be drawn in such a case, in the application of the privilege, might be a question; but it is certainly clear that it should be drawn well short of the point where the interrogator might have a substantial chance of striking pay dirt.

The case of Marcello v. Unied States, 5 Cir., 1952, 196 F.2d 437, 438, illustrates the situation we have in mind. There, appellant Marcello had been described in the press as a "crime czar", as the Louisiana head of the infamous Black Hand Society, as the Number 1 gangster and racketeer in Louisiana, who had established a virtual monopoly on criminal activity in that area. The newspaper articles described Marcello's alleged association with gangsters and racketeers in other parts of the United States. Marcello was summoned as a witness before the U. S. Senate Investigating Committee, charged broadly with an "investigation of whether organized crime utilizes the facilities of interstate commerce or otherwise operates in interstate commerce in furtherance of any transactions which are in violation of the law of the United States or of the State in which the transactions occur". At the outset Marcello announced, with due respect to the committee, that he was "going to refuse to answer any and all questions other than my name and place of residence on the ground that the answer might tend to incriminate me". Nevertheless, the committee proceeded to ask Marcello 166 specific questions, as to each of which he claimed his privilege. Marcello was indicted for the crime described in 2 U.S.C.A. § 192, see our discussion of this statute in Carlson v. United States, supra. Though the indictment was in 49 counts, he was convicted in the district court only on the basis of his refusal to answer six specific questions, including the question, "is there an indictment pending against you?", the question "Have you ever been outside the State of Louisiana?", and the question "Do you know Salvatore Vittali?". Upon appeal, the conviction was reversed. The court of appeals concluded that by an application of the test laid down in Hoffman v. United States, 1951, 341 U.S. 479, 71 S. Ct. 814, 95 L.Ed. 1118, in the particular background, it could not be said that the privilege was improperly claimed in any of the six instances upon which guilt was predicated in the district court. The court of appeals pointed out, 196 F.2d at page 441 that, while the witness could not assert his privilege against self-incrimination in advance of the questions actually propounded to him at the hearing, "we are nevertheless convinced that appellant's position at the hearing being virtually that of an accused upon trial relieves his blanket refusal of the capricious and contemptuous implications which it would otherwise bear." See also Kiewel v. United States, 8 Cir., 1953, 204 F.2d 1.

The relevance of the foregoing to the case at bar will now become apparent, we hope.

At the hearing before the district court, four witnesses were called on Maffie's behalf. They all testified to the same effect: That Maffie was under investigation by the FBI, and that Maffie had been informed of this fact together with the general tenor of the inquiries the FBI had been making about him, before he was summoned to testify at the grand jury investigation of the Brink's case.

John Simmons, who described his relationship to Maffie as "on a social basis only", testified that an agent of the FBI came to see him and gave him to under-

stand that they were investigating Maffie in connection with "a case he knows about." The agent inquired how well Simmons knew Maffie, whether he knew that Maffie had bought a new car, whether Maffie took "trips out of town", whether he knew "Specs" O'Keefe and other underworld characters. Promptly Simmons communicated to Maffie the substance of this interview, which action the district court was moved to characterize as a "tipoff".

William H. Burke testified that he had known Maffie for many years, dating back to their service together in the Army. He said he was interviewed twice by an agent of the FBI who wanted to know how much money Maffie had, whether he was "a spender". Burke asked the FBI agent whether they were questioning him "because of the Brink's case, and he didn't commit himself one way or another." After the second interview, Burke went to Maffie's house and "told him I was interviewed twice by the FBI concerning his activities. I asked him if it had anything to do with the Brink's case. He said: 'No'.".

Richard Rice testified that Maffie was his brother-in-law. An agent of the FBI came to ask him about Maffie. The agent said they were working on a confidential case, and asked him to keep the interview confidential. According to Rice the agent did not get much out of him about Maffie. In the first place, he told the agent he didn't think he ought to inform on his own family. In the second place, he said Maffie considered him a "rube" and never discussed his affairs with him. Subsequently Rice told Maffie in effect everything that had transpired at the interview with the FBI.

Robert G. Camerlengo testified that he had known Maffie for a year and a half, and that he too had been interviewed about Maffie by an agent of the FBI. The witness said the agent particularly asked him whether he had ever noticed Maffie spending large sums of money. The agent also asked Camerlengo "if I knew a lot of other people, whom I didn't know." Subsequently Camerlengo reported the interview to

Maffie, who showed him a warrant of distress involving an alleged failure by Maffie to pay federal income taxes.

There was also introduced in evidence, on Maffie's behalf, the affidavit filed by the special agent of the FBI in support of the application for a warrant authorizing a search of the home of "Specs" O'Keefe, and the warrant issued pursuant thereto. We referred to this search warrant in Carlson v. United States, supra.

Bearing this background in mind, what was Maffie reasonably to suppose, when he was called before the Brink's grand jury and asked by the Assistant U. S. Attorney at the outset to sign a document reciting that "I do hereby voluntarily waive immunity from prosecution for any offense of mine which shall be disclosed or indicated by me in so appearing and testifying or by any testimony which I may give or by any testimony or statements I may make in the presence of the said Grand Jurors?" Is it not fairly obvious that Maffie might reasonably have concluded that he was suspected of some complicity in the Brink's robbery, either as a participant, or as an accessory before or after the fact; that the prosecuting officials were hoping to get out of him some disclosures tending to implicate him in some way in connection with that crime, and had sought to prepare for this eventuality by endeavoring (unsuccessfully) to persuade him to sign a "waiver of immunity"? If Maffie was also under investigation for some crime involving federal income taxes, this would only be another ground of vulnerability which would heighten his apprehension of possible self-incrimination in the line of questioning about to begin.

The type of questioning to which he was then subjected could only have served to reenforce the impression that he was virtually in the dock as an accused person. Among the questions he was asked, and declined to answer on the ground of his privilege against self-incrimination, were (1) whether he had an occupation and what his occupation was; (2) whether he had talked to a lawyer about his

testimony before the grand jury and the name of the attorney he was contemplating retaining; (3) whether he was known as "Stretch"; (4) where he lived before he moved to his present residence; (5) whether he knew "Specs" O'Keefe and Stanley Gusciora, and numerous other underworld characters; (6) whether he had ever visited "Specs" O'Keefe or Stanley Gusciora at the Towanda Jail in Pennsylvania; (7) whether he had directly or indirectly ever contributed any money to be used by or for either Joseph O'Keefe or Stanley Gusciora; (8) numerous questions as to what Maffie had told FBI agents at interviews he allegedly had had with the FBI subsequent to the Brink's robbery; (9) whether he knew the location of Jimmy O'Keefe's Bar and Grille; (10) whether he knew the location of the Bostonian Hotel; (11) whether he had ever had any discussion about the Brink's case with anyone, in which he had expressed his theory as to how it happened.

 It was clear to the district court that Maffie had properly claimed his privilege with reference to all questions indicating any association between Maffie and "Specs" O'Keefe or Stanley Gusciora. But why would it tend to be incriminating for Maffie to answer whether he knew "Specs" O'Keefe? If such a question had been asked of some respectable citizen, such as O'Keefe's landlord or grocer, presumably an answer would not have been thought to be incriminating. The mere fact that the inquiry relates to a notorious criminal, believed to have been implicated in the robbery, is no ground for saying that any witness, asked such a question, is privileged to decline to answer on the ground of self-incrimination. The reason that this particular witness, Maffie, was excused from answering such questions must have been that he was under the justified impression that he was suspected of complicity in the Brink's case, and that any acknowledgment by him of acquaintance with or association with "Specs" O'Keefe might be the opening wedge for disclosures implicating Maffie in some criminal relationship with O'Keefe. But why, if

Maffie was excused from answering whether he knew "Specs" O'Keefe and Stanley Gusciora, was he directed to go back to the grand jury and answer a series of questions whether he knew numerous other underworld characters whose names kept cropping up throughout the grand jury investigation of the Brink's case, each of whose activities, presumably, the interrogator had some undisclosed reason for believing had relevance to the criminal case under inquiry? Nor does it take much imagination to understand why a person in the spot Maffie was in, when questioned before the grand jury, would have been reluctant to answer questions dealing with his occupation, or questions whether he knew the locations of various bars, restaurants, or hotels which presumably, in the interrogator's mind, had some undisclosed relevance to the Brink's case, perhaps as a hangout for gangsters suspected of complicity in the robbery.

We are convinced that the district court applied the privilege too narrowly, in directing Maffie to go back and answer most of the questions before the grand jury. It is possible that a few of the questions which Maffie declined to answer could have been answered without any tendency to incriminate him; but if so, the answers to this small residue would have been so far removed from any disclosures possibly useful to the prosecution that it would have been a perfectly futile thing to order Maffie to go back to the grand jury to answer them. We would be reluctant to uphold a conviction for criminal contempt based upon a refusal to obey the district court's order, so far as this insignificant residue is concerned; it would be too much like a case of the tail wagging the dog.

It is fairly to be inferred that the district court never would have ordered Maffie back to the grand jury if it had realized how few and trifling were the questions which Maffie might properly have been called upon to answer, giving a proper scope to the privilege against self-incrimination. This is apparent from the court's remark at the hearing: "I have sense enough to know when these

men are brought before the Grand Jury they are hoping against hope that someone will talk and tell something. I have no evidence before me that this man [referring to Maffie] was a participant at all. *If he was, I wouldn't order him to answer any question, not a fellow like O'Keefe."* [Italics added.] But for the reasons previously indicated we think it is clear that the district court need not believe, from the evidence before it, that the particular witness was a participant in the crime, in order to give a broad scope to the privilege against self-incrimination. It is enough that the witness had reasonable ground to fear that he was suspected by the prosecuting officials of being implicated somehow in the criminal transaction, and that he was being summoned before the grand jury in the hope that some incriminating disclosures could be extracted from him. That was certainly the case here.

The judgment of the District Court is vacated, and the case is remanded to that Court with direction to dismiss the proceeding against Adolph Maffie on the grand jury's presentment.

1. The other opinions in this group of cases are in Carlson v. United States, No. 4732, 1 Cir., 209 F.2d 209; Hooley v. United States, 1 Cir., 209 F.2d 219; O'Keefe v.